698 F.2d 61
 Fed. Sec. L. Rep. P 98,755, Fed. Sec. L. Rep. P 99,074
William B. WEINBERGER, et al., Plaintiffs-Appellees,
v.
James C. KENDRICK, et al., Defendants-Appellees,
Charles M. Coyne, et al., Appellants.
 Nos. 956-959, Dockets 81-7317, 81-7629, 81-7827, 81-7829.
 United States Court of Appeals,
Second Circuit.
 Argued April 19, 1982.
Decided July 14, 1982.
Order on Petitions for Rehearing Jan. 26, 1983.
 
 Benedict Wolf and Lester L. Levy, New York City (Wolf, Popper, Ross, Wolf & Jones, and Wolf, Haldenstein, Adler, Freeman & Herz, New York City), for plaintiffs-appellees.
 Philip C. Potter, Jr., Ogden N. Lewis and Denny Chin, New York City (Davis, Polk & Wardwell, New York City), for defendants-appellees.
 Bradley R. Brewer, New York City (Brewer & Soeiro, New York City), for appellants Coyne, Collins and 580 other named appellants.
 I. W. Bader, White Plains, N. Y. (Bader & Bader, White Plains, N. Y.), for appellants Lewy, Anderson, Barrie, Pine, Lapham, Garson, Howe, Barnes & Johnson and Jurkiewicz.
 Before WATERMAN, FRIENDLY and MESKILL, Circuit Judges.
 FRIENDLY, Circuit Judge:
 
 
 1
 These consolidated appeals are from a final judgment of Judge Duffy of the District Court for the Southern District of New York, entered on October 16, 1981, 91 F.R.D. 494, approving, pursuant to F.R.Civ.P. 23, the settlement of two securities class actions consolidated below--Weinberger, et al. v. Kendrick, et al., and Panzirer v. Peterkin, et al. The complaints in these actions, filed on October 3, 1975, and October 22, 1976, respectively, asserted claims on behalf of classes consisting of persons who had purchased securities of W. T. Grant Company (Grant) during the 34 months prior to that company's bankruptcy on October 2, 1975 (sometimes referred to hereafter as the class period). The defendants named in the actions were financial institutions (the banks) that loaned Grant more than $600 million prior to its bankruptcy,[1] and Dewitt Peterkin, Jr., a former vice-chairman of Morgan Guaranty and a Grant director. The complaints alleged that the defendants had dominated the management of Grant in the years preceding its bankruptcy and had concealed from the public both the seriousness of Grant's financial predicament and the inflated value of Grant securities. The plaintiffs asserted, among other things, claims against the defendant-appellees based on Sec. 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. Sec. 78j(b), Rule 10b-5 promulgated thereunder, 17 C.F.R. Sec. 240.10b-5, and common law fraud. The complaints in Weinberger and Panzirer were superseded by a consolidated amended complaint, filed July 25, 1980, along with the proposed settlement. In addition to the claims previously asserted, this advanced state law breach of fiduciary duty claims; the new complaint also expanded the plaintiff class to include persons who merely held Grant securities during the class period. The settlement approved by Judge Duffy would extinguish a number of these claims[2] in return for some $2.84 million,[3] which, after allowance of attorneys' fees, would be distributed to the plaintiff class. While no determination has been made how even the gross amount of the settlement compares to the amounts claimed, estimated by objectors' counsel as between $250 million and $1 billion, it is not disputed that the recovery will be only a negligible percentage of the losses suffered by the class. Both the plaintiffs and the defendants below are here as appellees defending the settlement's adequacy.
 
 
 2
 The appellants are a number of persons who purchased or held Grant securities during the class period. One group, the Coyne appellants, allegedly 583 in number, represented by Bradley R. Brewer, fit the above description simpliciter. The other group, the Lewy appellants, are the eight named plaintiffs in a class action, Index No. 17857-75, filed in September 1975 in the Supreme Court of New York County which is now against three of the lending banks, Morgan Guaranty, Chase Manhattan and Citibank, asserting some of the claims asserted in the Weinberger/Panzirer actions but only under state law. Appellants raise a number of procedural and substantive challenges to the determination that the settlement is fair, reasonable and adequate. We affirm.
 
 I. Background
 
 3
 On October 2, 1975, Grant, with recorded liabilities of well over a billion dollars, filed a petition in bankruptcy court in the Southern District of New York for an arrangement under Chapter XI of the former Bankruptcy Act. Grant's petition came after two years of declining earnings and credit ratings. When the company's publicly reported earnings for the year ending January 31, 1974, declined by some $85,000,000, rating agencies downgraded Grant's commercial paper, thereby effectively denying the company access to the commercial paper market. As a result, in the spring of 1974, Grant began to obtain financing from commercial banks, first on an ad hoc basis with credit lines from numerous lenders throughout the country, and later, in the fall of 1974, under a $600,000,000 committed revolving credit agreement arranged by the company's principal banks. Morgan Guaranty was the lead lender and acted as agent for the other banks, see note 1, supra. The revolving credit was secured by Grant's accounts receivable and certain securities it held in a subsidiary.
 
 
 4
 Despite the new credit, and various other steps taken by its lenders to ameliorate Grant's situation,[4] and contrary to rosy predictions by Grant's management, the company's financial position continued to deteriorate. The seriousness of this became fully apparent when an internal study ordered in the summer of 1975 by a new Grant president, Robert Anderson, was completed in late September: this revealed that the company had a negative net worth. The evidence indicates that the news came as a surprise to the banks and Grant's board. Grant's Chapter XI petition quickly followed.
 
 
 5
 Even more quickly came the first complaint in the Weinberger action, filed October 3, 1975. The complaint alleged that, as a result of their large loans, Grant's principal lenders had been in a position to, and in fact did, exercise considerable control over the management of the company in its final years. It further charged that the defendant banks and Grant's management had cooperated in presenting a misleadingly optimistic picture of the company's future to the public. The Panzirer complaint, filed on October 22, 1976, elaborated on this theme. It alleged that Peterkin became aware of Grant's true financial predicament in March, 1973, and passed this information to Morgan Guaranty, including the Trust and Investment Division, which thereafter sold virtually its entire holding of Grant securities on the open market. Motions for class certification were filed in Weinberger in June, 1977, and in Panzirer in August, 1977; the motions were later adjourned during settlement discussions and were not renewed until agreement had been reached.
 
 
 6
 The development and settlement of the Weinberger/Panzirer action require an understanding of Grant's bankruptcy proceedings. Some six months after the filing of Grant's Chapter XI petition, the Bankruptcy Court, on April 13, 1976, determined that the company could not be reorganized and ordered its liquidation. On July 2, 1976, the principal banks commenced an adversary proceeding seeking enforcement of security interests they held in property of Grant's estate, see p. 64, supra. In his September 24, 1976, answer, the trustee in bankruptcy challenged these security interests on the grounds that they were preferential transfers and fraudulent conveyances; more important for our purposes, he also claimed that, because of the control they allegedly exercised over Grant's affairs during the years 1973-75, the company's principal lenders should be equitably subordinated[5] to other claimants.
 
 
 7
 In an effort to substantiate his charges, particularly his claim to equitable subordination, the trustee conducted investigations throughout the remainder of 1976 and 1977 into the relationship between Grant and its lenders during the class period. He relied principally on testimony taken under Bankruptcy Rule 205 and on documents subpoenaed from various parties.[6] Rule 205 examinations were taken of all the principal officers and directors of Grant, the principal officers at Morgan Guaranty responsible for dealings with Grant, and two officers of other major lending banks. The testimony ran to some 10,000 pages. The trustee also subpoenaed those files of Grant's principal lenders which related to the company--comprising hundreds of thousands of documents.[7] In short, the trustee conducted a far-reaching and intensive probe of the banks' involvement in Grant's affairs during the class period.
 
 
 8
 Despite his extensive investigations, Grant's trustee concluded that his chances of proving any fraud or other wrongdoing by the lending banks were extremely slim, cf. 4 B.R. at 73-79 (Judge Galgay's approval of similar determinations by the trustee). Accordingly, he attempted, ultimately successfully, to settle the banks' claims. On February 24, 1978, the trustee and the banks entered into a settlement whereby the banks released their security interests in Grant's property in return for allowance of principal and interest on all prepetition loans which it was estimated would result in their receiving distributions of 55% or more of their claims, 4 B.R. at 59. The Bankruptcy Court, in a careful decision, 4 B.C.D. 597, issued on July 20, 1978, approved the settlement, and shortly thereafter the banks began receiving distributions. The appellees have averred that, despite the settlement, the banks will have lost more than $250,000,000 on their loans to Grant by the time the estate is fully liquidated.
 
 
 9
 Following approval of the settlement of the banks' claims, negotiations commenced regarding claims of holders of Grant's subordinated debt.[8] By April, 1979, an agreement had been reached and the trustee applied to the Bankruptcy Court for permission to offer the proposed settlement to holders of Grant's subordinated debt. On February 20, 1980, after six days of hearings on the proposed settlement, including cross-examination of the trustee, his counsel, and his chief staff assistant regarding the fairness of the settlement, Judge Galgay, in a second lengthy decision, 4 B.R. 53, approved the settlement. He expressly found, among other things, that the banks' relationship with Grant during the class period had been one of "arms-length negotiations" and that Grant's actions "reflected independent policy decisions", 4 B.R. at 76-77. Eleven bondholders appealed this order to the District Court for the Southern District of New York (Conner, J.), which stayed consideration of the appeals so that Bankruptcy Judge Galgay could supervise continuing negotiations among the bankruptcy trustee, the indenture trustee, the banks, and the debentureholders for an improved offer to the latter. Counsel for the debentureholders who had appealed from the order approving the earlier offer stipulated that these appeals be withdrawn with prejudice, and this was so ordered. On June 23, 1981, an amended offer was approved by Judge Galgay. Two groups of debentureholders appealed to the District Court (Duffy, J.) from the order approving the amended offer. In an opinion and order dated March 15, 1982, Judge Duffy affirmed the order, 20 B.R. 186. He rested his decision primarily on the ground of res judicata, although he also stated that the appeals were without merit. Two groups of debentureholders have appealed to this court.
 
 
 10
 After agreement in principle was reached regarding the claims of Grant's major creditors, efforts focused, in the fall of 1979, on settling the Weinberger and Panzirer actions. Plaintiffs' counsel had engaged in a wide range of discovery during the four years prior to the commencement of settlement discussions. They had access to, and reviewed, both the bank documents subpoenaed by the trustee and the testimony from the Rule 205 examinations he conducted. In addition, plaintiffs' counsel deposed several officers of Morgan Guaranty, paying particular attention to the relationship between that bank and Grant during the class period. Like Grant's trustee and Judge Galgay, however, plaintiffs' counsel found virtually nothing to substantiate their allegations against the banks: "[o]n the basis of all the evidence we were compelled to the conclusion that our chance of prevailing against the banks, while not nonexistent, was slim." With this in mind, and after rejecting as inadequate one settlement offer by the banks, plaintiffs' counsel agreed in late 1979 to the settlement of a number of the class action claims asserted in the Weinberger/Panzirer actions. An original settlement fund of $2.6 million agreed upon in May of 1980 was later increased to $2.84 million, which, with interest, now exceeds $3.5 million.
 
 
 11
 This proposed settlement was submitted to Judge Duffy for approval on July 25, 1980. It was accompanied by a consolidated amended complaint. Count I of the consolidated amended complaint. Count I of the consolidated amended complaint, brought on behalf of all purchasers of Grant securities during the class period, alleged, as had the Weinberger complaint, that the banks "were in a position to, and did, control, influence and participate in Grant's operations, including the disclosure and nondisclosure of information relating to Grant's financial condition," p 28, and that, using this control the banks "engaged in a scheme, plan and continuous course of conduct to present a falsely inflated and optimistic picture of Grant's ... financial condition, and to conceal the true nature of Grant's operations and deteriorating financial condition from the investing public ...." p 30. It also asserted that the purchasers of Grant securities during the class period had relied in purchasing the allegedly overvalued Grant securities upon false or misleading disclosures and nondisclosures resulting from the defendants' "course of conduct." Based on these allegations Count I of the complaint claimed violations of Sec. 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder, p 42, as well as of common law fraud principles, p 44.
 
 
 12
 Count II of the consolidated amended complaint asserted claims on behalf of a broader class of plaintiffs. In addition to purchasers of Grant securities, the class included persons not previously included in either the Panzirer or Weinberger classes--persons who merely held, rather than purchased, Grant securities during the class period, p 48(B). In addition to alleging the claims described above under the federal securities laws, p 49, the complaint charged that the defendants "have committed common law fraud and have breached their fiduciary duties to plaintiffs ....", p 58, the latter theory not having previously been expressly advanced by plaintiffs. All these claims were based upon factual allegations almost identical to those underlying the federal securities law claims. The banks were charged with having "caused Grant to delay disclosing facts relating to the financial condition of Grant" and having caused Grant "to delay for their own benefit the filing of a petition in bankruptcy by Grant," p 56.
 
 
 13
 Count III of the consolidated amended complaint, asserted on behalf of a class limited to purchasers of Grant common stock during the class period, alleged that Morgan Guaranty and Peterkin had violated Rule 10b-5 by engaging in insider trading during the class period. It also alleged that, during the class period, Morgan Guaranty was a controlling person of Grant under Sec. 20(a) of the Securities Exchange Act of 1934.
 
 
 14
 The proposed settlement agreement submitted to the district court along with the consolidated amended complaint, was accompanied by the parties' consent to the filing of the new complaint. In addition, the agreement requested the district court to enter an order determining, "for the purpose of effectuating the settlement", p 8(a), that the action be maintained as a class action on behalf of the previously discussed classes of purchasers and holders of Grant securities. Substantively, the settlement agreement provided for the release of the above-described class claims asserted in the consolidated amended complaint, as well as any related claims arising out of the same transactions which might have been asserted, cf. note 2, supra, in return for the payment to the class of some $2.84 million.
 
 
 15
 Submitted to Judge Duffy on July 25, 1980, along with the consolidated amended complaint and the proposed settlement agreement, were notices of the pendency of class action, the class action determination, the proposed settlement and settlement hearing, which were to be mailed to prospective class members. These notices, among other things, described the Weinberger/Panzirer action, set out the terms of the proposed settlement, defined the class that approval of the settlement would bind, and informed class members that they could opt out of the settlement, by so requesting before January 24, 1981,[9] or enter an appearance through counsel. Objections to the proposed settlement were required to be filed not later than two weeks before the scheduled February 18, 1982, fairness hearing; no deadline was set for submission of affidavits supporting the proposed settlement. Pursuant to the July 28, 1980, order of Judge Duffy, these notices were mailed to class members on December 9, 1980, and were published in the Wall Street Journal. In a January 19, 1981, motion to vacate the July 25 order, counsel for appellants alleged that the settlement was inadequate and that the class notification procedure was defective in a number of respects. Judge Duffy denied the motion on February 6, 1981.
 
 
 16
 On February 17, 1981, the appellees filed papers supporting the settlement, including lengthy affidavits from counsel for both plaintiffs and defendants attesting to the fairness and adequacy of the settlement. Judge Duffy conducted the fairness hearing the next day; appellants tell us that this took no more than 10 minutes. At this hearing counsel for appellants submitted a memorandum requesting that the court treat their January 19 motion and certain letters counsel had written to the court as timely objections to the settlement. Judge Duffy refused to do so, although in his opinion approving the settlement, 91 F.R.D. at 495 n.3, he also rejected the objections as without merit. By May 19, 1981--the deadline for filing proofs of claim--some 26,000 claims had been filed.
 
 
 17
 On August 13, 1981, Judge Duffy issued an opinion approving the proposed settlement as fair, reasonable and adequate. He found that "able and experienced" counsel for the class had conducted protracted arms-length negotiations in good faith; that "extensive" pre-trial discovery had enabled the parties to "fully ... evaluate the strengths and weaknesses of the class claims"; that both he and the parties properly could rely on factual and legal findings made by Bankruptcy Judge Galgay, In re W. T. Grant Co., 4 B.R. 53 (Bkrtcy.S.D.N.Y.1980), which dealt with the circumstances underlying the settlement and which indicated that the plaintiffs' "chances of prevailing were slim"; that the plaintiffs' claims were "complex" and "not easily proven", particularly in view of the "heavy burdens of proof" faced by plaintiffs and "vigorous defenses" asserted by defendants; and that a trial would inevitably involve "lengthy and costly litigation". He concluded that, "[i]n view of the difficulties plaintiffs would confront if this case went to trial, the recommendation of experienced counsel and the lack of individual objections to the settlement, I find that the sum offered by the defendants is acceptable". The opinion did not discuss most of the procedural objections considered in this opinion, perhaps because of the judge's finding that no timely objections were filed.[10]
 
 II. Discussion
 A. The Class Notice
 
 18
 We deal first with appellants' numerous challenges to the notice of class action and proposed settlement mailed to prospective class members on December 9, 1980. Appellants initially argue that the notice failed adequately to describe the proposed settlement. They also contend that it should have contained a wide variety of additional information more fully describing the terms of the proposed settlement and the manner in which the negotiations leading to it had been conducted.[11]
 
 
 19
 Although no rigid standards govern the contents of notice to class members, Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950), the notice must "fairly apprise the prospective members of the class of the terms of the proposed settlement and of the options that are open to them in connection with [the] proceedings", Grunin v. International House of Pancakes, 513 F.2d 114, 122 (8 Cir.), cert. denied, 423 U.S. 864, 96 S.Ct. 124, 46 L.Ed.2d 93 (1975), quoting Philadelphia Housing Authority v. American Radiator & Standard Sanitary Corp., 323 F.Supp. 364, 378 (E.D.Pa.1970), aff'd sub nom., Ace Heating & Plumbing Co. v. Crane Co., 453 F.2d 30 (3 Cir. 1971); see Mullane v. Central Hanover Bank & Trust Co., supra, 339 U.S. at 314, 70 S.Ct. at 657, and it must be neutral, see Grunin, supra, 513 F.2d at 122. Numerous decisions, no doubt recognizing that notices to class members can practicably contain only a limited amount of information, have approved "very general description[s] of the proposed settlement," Grunin v. International House of Pancakes, supra, 513 F.2d at 122. See In re Equity Funding Corp. of America Securities Litigation, 603 F.2d 1353, 1361-62 (9 Cir. 1979); Mendoza v. United States, 623 F.2d 1338, 1351-52 (9 Cir. 1980), cert. denied, 450 U.S. 912, 101 S.Ct. 1351, 67 L.E.2d 336 (1981), In re Corrugated Container Antitrust Litigation, 643 F.2d 195, 223-24 (5 Cir. 1981).
 
 
 20
 The December 9, 1980, class action notice, met the foregoing requirements. It fairly, accurately and neutrally described the claims and parties in the Weinberger/Panzirer litigation, as well as the terms of the proposed settlement and the identity of persons entitled to participate in it. The notice described in detail a related state court action--Lewy v. The Chase Manhattan Bank, N.A., et al., App.Div. 437 N.Y.S.2d 263--brought by counsel for the appellants.[12] It explicitly informed class members that "[p]articipation in the present settlement would preclude any participation in the Lewy case." The notice also explained that class members could exclude themselves from the settlement by requesting this prior to January 24, 1981, or could enter an appearance at the fairness hearing through counsel. Finally, it informed the class that the recovery would be subject to the district court's allowance of attorney's fees and expenses and that counsel expected to apply for fees not exceeding 25% of the settlement fund. There is little question that all this "fairly apprise[d]" prospective class members of the class action's pendency, the relevant terms of the proposed settlement, and their options in connection with that case. Those who wanted to probe more deeply could, as the notice plainly told them, examine "[t]he settlement stipulation and the papers and documents filed in this action ...."[13]
 
 
 21
 Appellants next contend that the mailing of individual notices to the last known addresses of all class members, as determined from the records of Grant and various brokerage houses and nominees, was inadequate since the addresses of many security-holders might have changed during the period since Grant's bankruptcy. Federal Rule of Civil Procedure 23(c)(2)[14] and Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 176, 94 S.Ct. 2140, 2151, 40 L.Ed.2d 732 (1974), require only that "each class member who can be identified through reasonable effort " (emphasis added), be notified. In In re Franklin National Bank Securities Litigation, 574 F.2d 662, modified, 599 F.2d 1109 (1978), we discussed the application of the Eisen requirement to classes consisting of purchasers of securities, noting the difficulty of ensuring that notice is received by persons whose purchases are recorded in "street names"--typically banks or brokerage houses. We disapproved the practice of sending class notices to street name addresses with a request that the recipient forward the notice to the beneficial holder of the securities but without an offer to defray the resulting expenses, 574 F.2d at 669-70. We indicated approval, however, of the use of bank and brokerage house records to compile a list of actual holders of securities to whom individual notices would be mailed, 574 F.2d at 672. Here appellees compiled such a list, mailed individual notices, and, in addition, published notice of the class action and settlement in the Wall Street Journal. Some 26,000 proofs of claim have been filed as a result of these notice procedures. The district court, in its July 28, 1980, order, expressly found this procedure adequate and we see no reason to disturb its finding, particularly since no alternative method of ascertaining class members' identities has been suggested to us, see Grunin v. International House of Pancakes, supra, 513 F.2d at 121-22 (individual mailing to last known address, without supplemental newspaper publication, approved, despite evidence that one third of prospective class did not receive notices).
 
 
 22
 Likewise, the timing of the notices, which were mailed on December 9, 1980; the opt-out deadline, January 24, 1981; the deadline for the filing of objections, February 4; the date affidavits in support of the settlement were filed, February 17; and the fairness hearing, February 18, were not beyond the authority of the court. According to Professor Moore, "[t]he manner of giving notice is committed to the sound discretion of the court," 3B Moore's Federal Practice p 23.80, at 23-513 (1982), as is suggested by Rule 23's statement that notice of settlement shall be "in such manner as the court directs". The notice, however, must be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections", Mullane v. Central Hanover Bank & Trust Co., supra, 339 U.S. at 314, 70 S.Ct. at 657, and it must "afford a reasonable time for those interested to make their appearance," id. Prospective class members had some six weeks in which to decide whether or not to accept the settlement. Although we think it would have been preferable if appellees' affidavits and other papers in support of the settlement had been required to be available at a date earlier than the eve of the hearing, the failure of the district court to demand this does not require reversal. Objectors were fully apprised of the terms of the proposed settlement and, although they did not avail themselves of the opportunity, had complete access to materials discovered in the case; this provided an adequate base from which objections could be developed. See 3 Newberg, Class Actions Sec. 5660d (1977). The requirement, challenged by appellants, that requests to opt-out be filed prior to the fairness hearing placed prospective objectors in no worse position than occurs when formal class certification precedes settlement; indeed, their position was better in that they knew the terms of the proposed settlement before having to decide whether to opt out.
 
 
 23
 Appellant's final procedural objections relate to appellees' having engaged in and concluded settlement negotiations prior to class certification and notice. Closely related to this, they challenge the simultaneous notification of class members of the class determination (for purposes of settlement) and the proposed settlement. We shall discuss this initially as if the class certification related solely to the class named in the earlier Weinberger/Panzirer complaints, i.e., claims arising from the purchase of Grant securities during the class period, and will deal later with the added problems arising from the inclusion of other claims.
 
 
 24
 In In re Franklin National Bank Securities Litigation, supra, 574 F.2d at 671-72 n.6, we questioned in dictum the practice of bypassing the formal class certification procedure and of sending simultaneous notice of the pendency of a class action and of a proposed settlement to prospective class members. We voiced concern that the practice might be "inconsistent with the requirement [of Rule 23] that certification as a class action be determined 'as soon as practicable after the commencement of the action' and the implication that the initial class notice should follow promptly after the certification," id., and said that "[s]o far as we are aware the only cases in which this question has been specifically passed upon have held that the sending of the initial class notice should not be postponed," id. Our hesitation to approve the practice echoed the concerns expressed in the Manual for Complex Litigation Sec. 1.46, at 60-61 (1977) (Manual ), which argues that the practice may create the possibility of collusion or improper pressure by defendants on "unofficial" counsel for the class. The Manual recommends a firm prophylactic rule prohibiting the bypassing of an early formal class certification and the formation of temporary classes for settlement purposes.
 
 
 25
 Despite the Manual's concerns and the misgivings expressed in the Franklin National Bank footnote, we concluded in Plummer v. Chemical National Bank, 668 F.2d 654, 656 (2 Cir. 1982), that "[a]lthough negotiations in the instant case were conducted by undesignated class representatives without pretrial discovery, this, standing alone, did not preclude judicial approval", 668 F.2d at 658. See also City of Detroit v. Grinnell Corp., 495 F.2d 448, 464-66 (2 Cir. 1974). A similar view is taken in Judge Wisdom's thorough opinion in In re Beef Industry Antitrust Litigation, 607 F.2d 167, 173-78 (5 Cir. 1979), cert. denied, 452 U.S. 905, 101 S.Ct. 3029, 69 L.Ed.2d 405 (1981), which carefully reviews the authorities and commentary on the question. Much like our decision in Plummer v. Chemical Bank, the Fifth Circuit concluded that:
 
 
 26
 A blanket rule prohibiting the use of temporary settlement classes may render it virtually impossible for the parties to compromise class issues and reach a proposed class settlement before a class certification. Such a firm restriction does not appear necessary or desirable. The hallmark of Rule 23 is the flexibility it affords to the courts to utilize the class device in a particular case to best serve the ends of justice for the affected parties and to promote judicial efficiencies.
 
 
 27
 * * *
 
 
 28
 * * *
 
 
 29
 Temporary settlement classes have proved to be quite useful in resolving major class action disputes. While their use may still be controversial, most courts have recognized their utility and have authorized the parties to seek to compromise their differences, including class action issues, through this means.
 
 
 30
 In re Beef Industry Antitrust Litigation, supra, 607 F.2d at 177-78, quoting 3 Newberg, Class Actions Sec. 5570c, at 479-80 (1977).
 
 
 31
 Other circuits have held that the absence of class certification prior to the notice of the settlement is not an absolute bar to approval. See Ace Heating & Plumbing Co. v. Crane Co., supra, 453 F.2d at 33; In re Corrugated Container Antitrust Litigation, supra, 643 F.2d at 223 ("Rule 23 includes no language proscribing combined notice of a class action and a proposed settlement."); Marshall v. Holiday Magic, Inc., 550 F.2d 1173, 1176 (9 Cir. 1977); Valerio v. Boise Cascade Corp., 80 F.R.D. 626, 639 (N.D.Cal.1978), aff'd, 645 F.2d 699 (9 Cir. 1981), cert. denied, 454 U.S. 1126, 102 S.Ct. 976, 71 L.Ed.2d 113 (1981).
 
 
 32
 Although we thus refuse to adopt a per se rule prohibiting approval when a class action settlement has been reached by means of settlement classes certified after the settlement, with notice simultaneous with that of the settlement, we emphasize that we are permitting, not requiring, use of this procedure, and also underscore that, as intimated by us in Plummer, supra, 668 F.2d at 658, district judges who decide to employ such a procedure are bound to scrutinize the fairness of the settlement agreement with even more than the usual care. This is necessary in order to meet the concerns, noted in the Manual, regarding the possibilities of collusion or of undue pressure by the defendants on would-be class representatives. Accordingly, we will demand a clearer showing of a settlement's fairness, reasonableness and adequacy and the propriety of the negotiations leading to it in such cases than where a class has been certified and class representatives have been recognized at an earlier date. As discussed below, we are satisfied that the settlement in this case meets these requirements.
 
 
 33
 B. The Fairness, Reasonableness and Adequacy of the Proposed Settlement
 
 
 34
 The central question raised by the proposed settlement of a class action is whether the compromise is fair, reasonable and adequate. There are weighty justifications, such as the reduction of litigation and related expenses, for the general policy favoring the settlement of litigation, 3 Newberg, Class Actions Sec. 5570c, at 479-80 (1977); cf. Williams v. First National Bank, 216 U.S. 582, 595, 30 S.Ct. 441, 445, 54 L.Ed. 625 (1910). In part to realize these advantages of settlements negotiated by litigants, we have long recognized that a district court's disposition of a proposed class action settlement should be accorded considerable deference, West Virginia v. Chas. Pfizer & Co., 440 F.2d 1079, 1085 (2 Cir.), cert. denied sub nom. Cotler Drugs, Inc. v. Chas. Pfizer & Co., 404 U.S. 871, 92 S.Ct. 81, 30 L.Ed.2d 115 (1971); Newman v. Stein, 464 F.2d 689, 692 (2 Cir.), cert. denied sub nom., Benson v. Newman, 409 U.S. 1039, 93 S.Ct. 521, 34 L.Ed.2d 488 (1972); City of Detroit v. Grinnell Corp., supra, 495 F.2d at 454-55 (2 Cir. 1974); Patterson v. Newspaper & Mail Delivery Union, 514 F.2d 767, 771 (2 Cir. 1975). The trial judge "is exposed to the litigants, and their strategies, positions and proof. He is aware of the expense and possible legal bars to success. Simply stated, he is on the firing line and can evaluate the action accordingly." Ace Heating & Plumbing Co. v. Crane Co., supra, 453 F.2d at 34. While this principle does not apply in full force when settlement of a class action has been negotiated before a class has been certified and a higher degree of judicial scrutiny is required, particularly when, as here, there is nothing to indicate that the district judge felt compelled to do this, it is not wholly deprived of force.
 
 
 35
 Determination whether a proposed class action settlement is fair, reasonable and adequate involves consideration of two types of evidence. The primary concern is with the substantive terms of the settlement: "Basic to this ... is the need to compare the terms of the compromise with the likely rewards of litigation." Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 424-25, 88 S.Ct. 1157, 1163, 20 L.Ed.2d 1 (1968). See also Newman v. Stein, supra, 464 F.2d 689; City of Detroit v. Grinnell Corp., supra, 495 F.2d at 455. In order to make this comparison, the trial judge must "apprise[ ] himself of all facts necessary for an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated." Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson, supra, 390 U.S. at 424, 88 S.Ct. at 1163. However, "all" cannot really mean "all". The Supreme Court could not have intended that, in order to avoid a trial, the judge must in effect conduct one. Saylor v. Lindsley, supra, 456 F.2d at 904; Newman v. Stein, supra, 464 F.2d at 691-92; City of Detroit v. Grinnell Corp., supra, 495 F.2d at 462. In order to supplement the thus necessarily limited examination of the settlement's substantive terms, attention also has been paid to the negotiating process by which the settlement was reached, and courts have demanded that the compromise be the result of arm's-length negotiations and that plaintiffs' counsel have possessed the experience and ability, and have engaged in the discovery, necessary to effective representation of the class's interests, City of Detroit v. Grinnell Corp., supra, 495 F.2d at 463-66.
 
 
 36
 The appellants, citing Protective Committee v. Anderson, supra, argue at great length that the lower court's two page opinion demonstrates that it did not adequately scrutinize either the substantive terms of the proposed settlement or the propriety of the process of negotiations. We see nothing in the latter point. The district court noted the absence of any indication of collusion, the protracted settlement negotiations, the ability and experience of plaintiffs' counsel, the extensive discovery preceding settlement and the fact that counsel for all parties--including the objectors--had access to materials produced in discovery, including the extensive and detailed discovery of Grant's trustee, who commanded financial resources and professional assistance, see note 6, supra, not always available to plaintiffs' counsel in class actions. All these considerations, as previous decisions have noted, City of Detroit v. Grinnell Corp., supra, 495 F.2d at 465; In re Beef Industry Antitrust Litigation, supra, 607 F.2d at 176; Plummer v. Chemical Bank, supra, 668 F.2d at 658, are important indicia of the propriety of settlement negotiations. Indeed, as discussed more fully below, plaintiffs' presettlement preparation and discovery efforts in this case were substantially more thorough than those in many other decisions where settlements have been approved.
 
 
 37
 We are almost equally confident as regards the substantive terms of the proposed settlement. Although the district court's discussion of this was rather cursory, our own examination of the record leads us to conclude that the court had before it sufficient materials to evaluate the settlement and came to the correct conclusion.
 
 
 38
 Both the defendants and plaintiffs in Weinberger/Panzirer submitted lengthy affidavits to the district court. These carefully described the history of the litigation and, more important, thoroughly canvassed the evidence, both that supporting and that refuting plaintiffs' claims. As noted above, this evidence included the materials amassed in the trustee's investigation. Since his claim of equitable subordination required a detailed inquiry into the relationship between the banks and Grant, which is precisely the issue raised in the Weinberger/Panzirer actions, his discovery efforts were extremely relevant to the plaintiffs' claims. The lower court also had the unusual and important benefit of several careful and well-reasoned opinions by Bankruptcy Judge Galgay, see pp. 7-8, supra. These opinions, particularly as they related to the equitable subordination question, provided excellent guidance from a disinterested source on questions central to the fairness and adequacy of the proposed settlement. Taken together, these materials provided a satisfactory record on which the district court could base its decision.
 
 
 39
 Moreover, from what we have distilled from the record, we think the district court's decision met the higher standard of scrutiny we believe appropriate in this case. As plaintiffs' counsel observed, "[i]n weighing the class' chance of prevailing on the merits in the case against the banks it was ... important to differentiate between proving the liability of a bankrupt Grant to the class and proving any liability on the part of the defendant banks, who themselves lost hundreds of millions of dollars by reason of their transactions with Grant during the class period." Levy Affidavit p 59. Central to plaintiffs' claims against the banks under both the federal securities laws and the common law was the allegation that the defendants "were in a position to, and did, control, influence and participate in Grant's operations." Consolidated Amended Complaint p 28. This precise point had been considered by Judge Galgay in Grant's bankruptcy proceedings. He said:
 
 
 40
 I am satisfied that in the case of Grant the transactions between the Bank Claimants and Grant are the result of arms-length negotiations conducted in good faith and governed by the dictates of sound business judgment. I have reviewed the evidence and, in particular, the portions of testimony elicited in examinations pursuant to Bankruptcy Rule 205(a) which the [objectants] claim establish control and domination on the part of the Bank Claimants. The excerpts referred to by the [objectants] constitute but a small portion of the vast amount of information, facts and materials considered by the Trustee. To a considerable extent, the "facts" presented by the [objectants] are based upon hearsay testimony, distortions of testimony, out-of-context statements or misstatements.
 
 
 41
 The record establishes the converse. It appears that the action taken by Grant reflected independent policy decisions and not rigid submission to the dictates of the Bank Claimants. Mr. Sundman, a chief financial officer of Grant who had been appointed a director in 1974, testified that he operated without instructions from the Bank Claimants and that the advisory group organized by the Bank Claimants in 1974 offered neither suggestions nor opinions as to the business operations of Grant. There has been no evidence introduced by the [objectants] which would tend to establish that the Bank Claimants prevented Grant from initiating a proceeding under the Bankruptcy Act in 1974 or 1975. The record demonstrates that prior to the decision made by the Grant Board of Directors during the end of September 1975 to seek relief under the Bankruptcy Act, both the Bank Claimants and Grant management viewed Grant as a turnaround situation and not insolvent.
 
 
 42
 Accordingly, it must be concluded that the probabilities of success as to the prosecution of claims of equitable subordination are very remote. In that context, the Trustee's recommendation is well founded.
 
 
 43
 4 B.R. at 76-77 (footnote omitted).
 
 
 44
 Likewise the affidavit of plaintiffs' counsel described the uncontradicted deposition statements of various officers of Morgan Guaranty to the effect that the bank was "not capable or desirous of making management decisions and did not attempt to tell Grant how to run its business."
 
 
 45
 The evidence adduced in discovery had also failed to support plaintiffs' claims in other respects. Counsel for the plaintiffs averred that the evidence indicated that "the banks themselves were misled by Grant's management's statements and projections that the fortunes of Grant would recover." Levy Affidavit p 56. The allegation, advanced in the Panzirer action, and Count III of the consolidated amended complaint, that Morgan Guaranty's Trust and Investment Division had sold approximately one million shares of Grant common stock in 1973 based on inside information obtained from Peterkin regarding Grant's financial condition, was also belied by the evidence. Peterkin testified that in 1973 he had not foreseen Grant's later troubles. Harrison U. Smith, Vice-Chairman of Morgan Guaranty's Trust and Investment Committee, testified that the decision to sell Grant securities had been reached in 1972 and that no discussions with Peterkin had occurred. Plaintiffs' counsel frankly conceded, "[w]e do not have any hard evidence to contradict Smith" and admitted that the fact that Morgan commenced selling Grant shares in 1972 severely cut against his case.
 
 
 46
 We should thus have no difficulty in affirming the approval of the settlement were it not for appellants' contentions based on the inclusion in the consolidated amended complaint and thus in the settlement of "state law" claims arising from the purchase of Grant securities prior to the "class period" but held into or beyond the period--a subject to which we now turn.
 
 
 47
 C. The Inclusion of Claims Arising Out of the Mere Holding of Grant Securities
 
 
 48
 So far as concerns a class member who had purchased Grant securities prior to and during the class period, the court clearly had jurisdiction to entertain the claims arising from mere holding as well as those arising from purchase as a matter of pendent jurisdiction. The requirement of United Mine Workers v. Gibbs, 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966), that federal and state claims share a "common nucleus of operative fact" before the doctrine may apply is satisfied, as our discussion of the similarities between the rule 10b-5 and the state common law claims, pp. 31-35, infra, demonstrates. Likewise, there is no question that plaintiffs' Rule 10b-5 claims are constitutionally "substantial". The requirement of "an examination of the posture in which the nonfederal claim is asserted and of the specific statute that confers jurisdiction over the federal claim, in order to determine whether 'Congress ... has ... expressly or by implication negated' the exercise of jurisdiction over the particular nonfederal claim," Owen Equipment & Erection Co. v. Kroger, 437 U.S. 365, 373, 98 S.Ct. 2396, 2402, 57 L.Ed.2d 274 (1978), is readily met since the Securities Exchange Act's conferral of exclusive jurisdiction on federal courts, Sec. 27, for violations of that act permits adjudication of all related claims only in those courts, see International Controls Corp. v. Vesco, 593 F.2d 166, 175 n.5 (2 Cir.), cert. denied, 442 U.S. 941, 99 S.Ct. 2884, 61 L.Ed.2d 311 (1979).
 
 
 49
 A more difficult jurisdictional question would be raised by the inclusion of persons having only claims arising from purchases prior to the class period, if such there be. Such a person would lack the federal claim necessary as a predicate to pendent jurisdiction; federal jurisdiction with respect to him seemingly would have to rest on the notion that when there is federal jurisdiction over the claims of many parties having both federal and state claims with a common nucleus of law and fact, a federal court, in the exercise of sound discretion, may also join as plaintiffs persons holding only state claims having such a nexus.
 
 
 50
 The law on this subject, including the Supreme Court's decision in Aldinger v. Howard, 427 U.S. 1, 96 S.Ct. 2413, 49 L.Ed.2d 276 (1976), is fully discussed in 3A Moore, Federal Practice p 20.07 [5.-1]-[5.-3] (1982). Although the Aldinger Court disapproved of the joinder of a pendent party defendant in the case before it, the Court explicitly limited its conclusion to "the issue of so-called 'pendent party' jurisdiction with respect to a claim brought under [28 U.S.C.] Secs. 1343(3) and [42 U.S.C.] 1983", id. at 18, 96 S.Ct. at 2422, and noted that "[o]ther statutory grants and other alignments of parties and claims might call for a different result," id., and that "it would be as unwise as it would be unnecessary to lay down any sweeping pronouncement upon the existence or exercise of such jurisdiction", id.
 
 
 51
 The circumstances here are about as powerful for the exercise of pendent party jurisdiction as can be imagined. The exclusivity of federal jurisdiction over claims for violation of the Securities Exchange Act makes a federal court the only one where a complete disposition of federal and related state claims can be rendered. Cf. the Court's comment in Aldinger that "[w]hen the grant of jurisdiction to a federal court is exclusive, for example, as in the prosecution of tort claims against the United States under 28 U.S.C. Sec. 1346, the argument of judicial economy and convenience can be coupled with the additional argument that only in federal court may all of the claims be tried together," 427 U.S. at 18, 96 S.Ct. at 2422. The concern most frequently voiced with regard to the pendent party doctrine is that it requires a party not otherwise subject to suit in federal court to defend himself in that forum, see Aldinger v. Howard, supra, 427 U.S. at 18, 96 S.Ct. at 2422. In this case pendent party jurisdiction serves, see Almenares v. Wyman, 453 F.2d 1075, 1084-85 (2 Cir. 1971), cert. denied, 405 U.S. 944, 92 S.Ct. 962, 30 L.Ed.2d 815 (1972), to extend federal jurisdiction to a new group of plaintiffs. Pursuant to the opt-out procedures established by the district court, plaintiffs who did not wish to have their claim settled in a federal forum and in fact received notice of the settlement needed only to request exclusion. Finally, the state law claims asserted on behalf of the pendent plaintiffs are already before the federal courts, having been asserted on behalf of persons who purchased Grant securities during the class period.[15]
 
 
 52
 Appellants contend further that what was done here with respect to claims arising out of purchases of Grant securities before the class period was, for all practical purposes, what we condemned in National Super Spuds, Inc. v. New York Mercantile Exchange, 660 F.2d 9 (2 Cir. 1981). We disagree. In that case class certification had been ordered fairly early in the game; the class was limited to persons who had purchased May 1976 Maine Potato Future Contracts and were damaged in liquidating such contracts between April 13, 1976, and the close of trading on May 7, 1976. The settlement, executed a year after notice of the certification had been sent and long after the opting out period had expired, purported to settle claims going beyond those asserted on behalf of this class and including the objector's claims for losses on contracts which were not liquidated on or before May 7, 1976, but on which he claimed to have suffered a loss thereafter. However, the proceeds of the settlement were to go solely to persons who had suffered losses on contracts which were liquidated on or before May 7, 1976.
 
 
 53
 The situation here is quite different. Before the class was certified, it was expanded to include persons holding state as well as federal claims. The notice sent to security holders clearly stated this and afforded an opportunity to opt out. Moreover, the settlement made provision for payments to holders of state claims although these were generally less than to holders of federal claims. We have no intention to depart in any way from National Super Spuds ; we simply find it inapplicable to the facts here and hold, in agreement with other courts, that there is no rigid rule against the addition of new claims shortly before submission of a proposed settlement provided that proper notice and opportunity for opting out are afforded, see Cherner v. Transitron Electronic Corp., 221 F.Supp. 48, 50 (D.Mass.1958); Heddendorf v. Goldfine, 167 F.Supp. 915, 921, 928 (D.Mass.1958); Pergament v. Frazer, 93 F.Supp. 13, 20 (E.D.Mich.1950), aff'd sub nom., Masterson v. Pergament, 203 F.2d 315 (6 Cir.), cert. denied, 346 U.S. 832, 74 S.Ct. 33, 98 L.Ed. 355 (1953), and that the settlement fairly and adequately provides for the new claims. See also National Super Spuds v. New York Mercantile Exchange, supra, 660 F.2d at 18 n.7; TBK Partners Ltd. v. Western Union Corp., 675 F.2d 456 (2nd Cir. 1982).
 
 
 54
 In considering whether the settlement discriminated unfairly against the state versus the federal claims, we confront the reiterated contention by appellants that the state law fraud and breach of fiduciary duty claims faced less worrisome legal obstacles than did the federal securities law claims. Such a position runs counter to generally received learning. 5 Jacobs, Litigation and Practice under Rule 10b-5, Sec. 11.01, at 1-272 to 1-273 (1981) (footnotes omitted) ("it is now generally agreed that [rule] 10b-5 is procedurally more advantageous and substantively broader than the common law.") (citing cases); Shapiro v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 495 F.2d 228, 239 (2 Cir. 1974) (citing cases). For example, the plaintiff's burden of proof in a common law fraud case--clear and convincing evidence--is more demanding than in a Rule 10b-5 case. Rudman v. Cowles Communications, Inc., 30 N.Y.2d 1, 330 N.Y.S.2d 33, 280 N.E.2d 867 (1972); Pierce v. Richard Ellis & Co., 62 Misc.2d 771, 773, 310 N.Y.S.2d 266, 269 (Civ.Ct.1970); Ajax Hardware Mfg. Corp. v. Industrial Plants Corp., 569 F.2d 181, 186 (2 Cir. 1977); 5 Jacobs, supra, at 1-277. Similarly, Rule 10b-5 is typically regarded as better suited than common law fraud principles for application to novel theories of securities frauds--which is admittedly the type of action involved in Weinberger/Panzirer, see, e.g., Frohling, The Promoter and Rule 10b-5; Basis for Accountability, 48 Cornell L.Q. 274, 290 (1963). The one element in which Rule 10b-5 is more rigorous against a plaintiff than New York law, which appellants assume would apply to the common law fraud claims, is its requirement that the fraud be "in connection with" the purchase or sale of a security, see Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 730, 95 S.Ct. 1917, 1922, 44 L.Ed.2d 539 (1976), in contrast to the rule of New York law whereby persons who merely held Grant securities would have been permitted to show reliance by proving that defendants' alleged misrepresentations and nondisclosures caused them to hold securities they would otherwise have sold. Continental Insurance Co. v. Mercadante, 222 A.D. 181, 225 N.Y.S. 488 (1927); 24 N.Y.Jur.Fraud and Deceit Sec. 165, at 233-34 (1962 & 1982 Supp.). This, however, simply shows which claims get into the federal basket, not that those that don't are more valuable than those that do. In the light of all this, we conclude that the common law fraud claims against the defendants were generally less valuable than the Rule 10b-5 claims of actual purchasers of Grant securities, and that it was not unfair for the settlement's distribution formula to reflect this.
 
 
 55
 We are similarly unimpressed by the appellants' contentions as to the strength of their common law breach of fiduciary duty claims. Appellants make much of the point that under New York law the general rule that plaintiff has the burden of proving fraud is "somewhat relaxed in cases where a fiduciary relation exists between the parties to a transaction, and where one has a dominant and controlling force over the other", 24 N.Y.Jur. Sec. 278, at 360 (1962 & 1982 Supp.). Application of this principle ordinarily has been limited to relationships such as those between "guardian and ward, trustee and cestui que trust, attorney and client, and physician and patient", id., with more recent extensions to relationships such as those between social worker and client, Hector M. v. Commissioner of Social Services, 102 Misc.2d 676, 425 N.Y.S.2d 199 (Family Ct. N.Y.City 1980) (ad hoc application only), and nursing home and patient, Gordon v. Bialystoker Center & Bikur Cholim, Inc., 45 N.Y.2d 692, 412 N.Y.S.2d 593, 385 N.E.2d 285 (1978). In order for the principle to apply plaintiffs must affirmatively show the existence of a fiduciary relationship between defendants and themselves, which requires judicial inquiry into the legitimate expectations of the parties and, more generally, the practical implications of recognition of a fiduciary relationship, 24 N.Y.Jur. Sec. 278 (1962 & 1982 Supp.); see Diamond v. Oreamuno, 24 N.Y.2d 494, 301 N.Y.S.2d 78, 248 N.E.2d 910 (1969); Frigitemp Corp. v. Financial Dynamics Fund, 524 F.2d 275, 278-79 (2 Cir. 1975). Plaintiffs would have faced serious difficulties in establishing the existence of a fiduciary relationship between a lending bank and the security holders of a borrowing corporation. While such a development is not beyond the realm of possibility, it would have required a significant extension of existing procedures. The fiduciary relation recognized in Diamond v. Oreamuno, supra --between a manager of a corporation and its shareholders--has been accorded such status for nearly a century. In contrast, appellants have cited us to no decisions in which a fiduciary relationship was found to exist between a bank and its borrower's security holders. Moreover, the extension of fiduciary principles to this relationship would face serious obstacles, such as arguments that lending relations between banks and large corporations are the product of arm's-length bargaining and that it would be anomalous to require a lender to act as a fiduciary for interests on the opposite side of the negotiating table.[16] Similarly, Bankruptcy Judge Galgay's findings that "the transaction between the Bank Claimants and Grant are the result of arms-length negotiations" and "the action taken by Grant reflected independent policy decisions", 4 B.R. at 76-77, would cut strongly against the application of fiduciary principles to the banks in this case.
 
 
 56
 Even assuming that the banks could be shown to stand in a fiduciary relation to Grant's security holders, the record indicates that neither they nor Peterkin, who as a director concededly was in such a relation, engaged in any wrong-doing. Indeed, as the above-quoted findings of Judge Galgay on the closely-related subject of equitable subordination show, see pp. 24-26, supra, there is virtually no evidence that the defendants engaged in any wrongdoing in their dealings with Grant. In light of all this, we agree with appellees that the state law claims were extremely weak and that the proposed settlement's treatment of such claims was fair and adequate, even though the fairness of the treatment of claims added on the eve of settlement is subject to especial scrutiny. Finally, as to the settlement's release of unasserted class claims arising out of the facts underlying the consolidated amended complaint, appellants have suggested no such claims, and we are aware of none, which would have had even the slight chance of success that the Rule 10b-5 and common law claims possessed.
 
 D. The Lack of an Evidentiary Hearing
 
 57
 We next deal with appellants' contention that the district court erred in refusing to conduct an evidentiary hearing preceded by additional discovery on the adequacy of the settlement. As the court below observed, counsel for appellants have had complete access to the extensive materials compiled in this litigation in the bankruptcy proceedings, and their state court claim provided them with yet another route for discovery. Appellants appear to have done little to explore any of these options. In addition, they came forward with no specific objections to the substantive fairness of the settlement, and they have provided no specific criticisms of Judge Galgay's careful examination of the relationship between the banks and Grant. Moreover, aside from expressing a desire to cross-examine plaintiffs' counsel regarding their efforts in the litigation, appellants did not suggest what further efforts at discovery might be pursued.
 
 
 58
 On these facts we see no reason to require an evidentiary hearing preceded by discovery. The only objections raised by appellants which have required serious consideration deal with points of law. Given the adequacy of the existing record and the absence of cogent factual objections to the settlement, we do not see what purpose an evidentiary hearing would have served. As we said in City of Detroit v. Grinnell Corp., supra, 495 F.2d at 464:Although the parties reaching the settlement have the obligation to support their conclusion to the satisfaction of the District Court, once they have done so, they are not under any recurring obligation to take up their burden again and again ad infinitum unless the objectors have made a clear and specific showing that vital material was ignored by the District Court.
 
 
 59
 III. Propriety of the Fee Award against Appellants
 
 
 60
 One other matter requires discussion. On February 13, 1981, five days before the scheduled February 18 fairness hearing, Mr. Brewer served subpoenas duces tecum on counsel for both plaintiffs and defendants. The subpoena served on lead counsel for the banks, Davis Polk & Wardwell, sought production of "[a]ll documents and records ... relating to the commencement, prosecution and settlement" of the Weinberger/Panzirer action, and listed ten categories of documents. Mr. Brewer claims that in a subsequent phone conversation with an attorney at Davis Polk he limited the scope of the subpoena; the attorney averred that even if Mr. Brewer's recollection was correct, he continued to seek production of an extremely wide range of materials, many of which he must have known to be privileged.
 
 
 61
 On February 17 Davis Polk applied for an order to show cause why an order quashing the subpoena and awarding Morgan Guaranty $1,800 in attorneys' fees and expenses should not be issued. Counsel for the plaintiffs also moved to quash the subpoena, but did not seek a fee award. Judge Duffy did not sign the Davis Polk order, but, in an endorsement on the application, stayed the subpoena. A copy of Judge Duffy's endorsement was delivered to Mr. Brewer on February 17, although it appears he was not then informed of Davis Polk's request for fees. At the February 18 fairness hearing, Judge Duffy briefly questioned Mr. Brewer as to why he had served the February 13 subpoenas. Not satisfied with Mr. Brewer's responses, he imposed two $2,500 fee awards against him, one to plaintiffs' attorneys, and the other to Davis Polk. These were later reduced to a single $1,800 award to Davis Polk.
 
 
 62
 Appellees argue that the award against Mr. Brewer was warranted because he acted "vexatiously both in issuing subpoenas seeking obviously privileged materials ... and in doing so without having properly identified any client or having properly filed any objections." Mr. Brewer vigorously denies these charges, averring that "the subpoenas in question were issued by my office in good faith on my part and in the honest belief and expectation that the proceedings at the hearing on the fairness and adequacy of the proposed settlement would be evidentiary and adversary in nature." Brewer Affidavit p 4. He stated that he intended to use the documents produced to attack the adequacy of plaintiffs' preparations for the case.
 
 
 63
 "The general American rule governing allocation of the costs of litigation places the burden of counsel fees on each party ...." Nemeroff v. Abelson, 620 F.2d 339, 348 (2 Cir. 1980), citing Alyeska Pipeline Service Co. v. Wilderness Society, 421 U.S. 240, 247, 95 S.Ct. 1612, 1616, 44 L.Ed.2d 141 (1975). There is, however, an "exceptional power to shift fees where an action has been commenced or conducted 'in bad faith, vexatiously, wantonly or for oppressive reasons.' " F. D. Rich Co. v. United States ex rel. Industrial Lumber Co., 417 U.S. 116, 129, 94 S.Ct. 2157, 2165, 40 L.Ed.2d 703 (1974); Browning Debenture Holders' Committee v. DASA Corp., 560 F.2d 1078 (2 Cir. 1977). We have previously found that a procedural step such as the issuance of "dragnet subpoenas", id. at 1088-89, may constitute bad faith or vexatiousness. We have required, however, a high degree of specificity in the factual findings of lower courts when attorneys' fees are awarded on the basis of bad faith, id. at 1089, and that there be "clear evidence" that the challenged actions "are entirely without color and [are taken] for reasons of harassment or delay or for other improper purposes", Nemeroff v. Abelson, supra, 620 F.2d at 348, quoting Browning Debenture Holders' Committee v. DASA Corp., supra, 560 F.2d at 1088. These requirements are a sound means of ensuring that persons with colorable claims will not be deterred from pursuing their rights by the fear of an award of attorneys' fees against them, see id. at 1088.
 
 
 64
 The district court offered little by way of explanation for its fee award. At the February 18 fairness hearing, when the awards were initially imposed--even in favor of the plaintiffs who had not sought one--no reasons were stated. In a brief order of March 26, 1981, the court characterized the subpoenas as "on their face, grossly overbroad". The order also relied on the fact that "there were no objections" to the settlement in determining that the issuance of the subpoenas was improper.
 
 
 65
 The record does not support a finding that there was "clear evidence" of bad faith or vexatiousness. Mr. Brewer contends that he was expecting an evidentiary hearing to be held on February 18 and that he needed to have the documents in court, particularly since the affidavits supporting the settlement were not yet available. His phone conversation with Mr. Lewis narrowing the scope of the document request was at least some evidence that he had not in fact been acting in bad faith in issuing the February 13 subpoenas. As noted previously, the judge erred with respect to the absence of any objections to the proposed settlement. Davis Polk contends that Mr. Brewer had no standing to be heard on February 18 since all his clients who had filed objections had withdrawn them. The judge did not so find and this is not plain to us. In short, while not applauding Mr. Brewer's conduct, we do not think it reached the level at which the sanction of a fee award would be justified.
 
 
 66
 The judgment approving the settlement is affirmed. The order imposing sanctions on Brewer is reversed. No costs.
 
 FURTHER ORDER ON PETITIONS FOR REHEARING
 
 67
 On September 10, 1982, we entered an unpublished order on petitions for rehearing and suggestions for rehearing in banc filed by both sets of appellants with respect to our opinion of July 14, 1982, slip opinions at 61, in which we affirmed an order of Judge Duffy, in the District Court for the Southern District of New York, approving the settlement of class actions brought by purchasers of W.T. Grant Co. securities alleging violations of federal and state securities law. We corrected a factual statement, slip opinions at 67, full paragraph, last sentence, in a manner stated therein. Beyond that we noted the contention made on behalf of the Coyne appellants that by affirming Judge Duffy's order approving the settlement despite his failure to render more than a cursory opinion, we had placed ourselves in conflict with In re General Motors Corp. Engine Interchange Litigation, 594 F.2d 1106 (7 Cir.), cert. denied sub nom. Oswald v. General Motors Corp., 444 U.S. 870 (1979), and Girsh v. Jepson, 521 F.2d 153 (3 Cir.1975), and indeed had ignored the command of Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414 (1968). We stated that we had no intention of doing anything of the sort but rather had regarded this as a unique situation where, because of the careful and well-reasoned opinions of Bankruptcy Judge Galgay on closely related issues arising in the bankruptcy liquidation of Grant, the district judge could properly have considered himself relieved of what would otherwise have been his obligation to make a detailed assessment of the settlement. See slip opinions at 74. However, because the point had not been adequately brought to our attention, we had not sufficiently focused on the fact that Judge Galgay's findings and conclusions were being seriously attacked in an appeal in the Grant bankruptcy proceedings that would shortly reach this court. We therefore directed that argument on the appeal from the order of Judge Duffy affirming Bankruptcy Judge Galgay's order in the Grant bankruptcy proceedings (hereinafter the Cosoff and Miller appeals) be heard before this same panel and ordered that issuance of the mandate in this case by stayed pending further order of this court.
 
 
 68
 Because of the number of issues raised in the Cosoff and Miller appeals, the need to supplement the inadequate record that had been filed, and the fact that Judge Duffy had rested his approval in that case primarily on res judicata, disposition of those appeals has taken longer than we had anticipated. However, by decision filed today, In re W.T. Grant Co., we have generally approved Judge Galgay's findings of fact and conclusions of law in his opinion of February 20, 1980, 4 B.R. 53, as supplemented by his order of June 23, 1981, approving the settlement with the subordinated debentureholders there at issue. Specifically, after examining the findings and conclusions submitted by counsel for the trustee in bankruptcy in that case, we have rejected the assertions made by attorney Brewer, both in that case and in this, that Judge Galgay had simply rubber-stamped the submissions of counsel for the trustee, a practice disapproved by United States v. El Paso Natural Gas Co., 376 U.S. 651, 656-67 (1964). Taking note of that decision Judge Galgay said he had adopted the trustee's proposed findings of fact where he had found no reason to do otherwise; however, he formulated his own discussion of the law of equitable subordination, the issue that is of particular moment here. In light of his opinion and our own examination of much of the evidence, we find that the chances of plaintiffs' establishing that the banks promoted a public belief in the viability of Grant which the banks did not share are extremely problematic.
 
 
 69
 We thus adhere to our opinion of July 14, 1982. In doing so we reaffirm the duty of district judges in this circuit to make a considered and detailed assessment of the reasonableness of proposed settlements of class actions, as held by the Third Circuit in Girsh, supra, 521 F.2d 153, 157-58, 159-60, and by the Seventh Circuit in General Motors, supra, 594 F.2d 1106, 1132 n. 44.
 
 
 70
 The factual correction made by our order of September 10, 1982, is further revised as follows: Strike last sentence of the full paragraph on p. 67 and substitute:
 
 
 71
 Eleven bondholders appealed this order to the District Court for the Southern District of New York (Conner, J.), which stayed consideration of the appeals so that Bankruptcy Judge Galgay could supervise continuing negotiations among the bankruptcy trustee, the indenture trustee, the banks, and the debentureholders for an improved offer to the latter. Counsel for the debentureholders who had appealed from the order approving the earlier offer stipulated that these appeals be withdrawn with prejudice, and this was so ordered. On June 23, 1981, an amended offer was approved by Judge Galgay. Two groups of debentureholders appealed to the District Court (Duffy, J.) from the order approving the amended offer. In an opinion and order dated March 15, 1982, Judge Duffy affirmed the order, 20 B.R. 186. He rested his decision primarily on the ground of res judicata, although he also stated that the appeals were without merit. Two groups of debentureholders have appealed to this court.
 
 
 72
 The petitions for rehearing are thus granted insofar as concerns the correction of the factual statement but are otherwise denied. The clerk will take appropriate steps with respect to appellants' suggestion for rehearing in banc. The stay of the mandate will be revoked if no judge in regular active service requests rehearing in banc or, if this is done, such a request is denied.
 
 
 
 [1]
 The principal lender to Grant was Morgan Guaranty Trust Company of New York (Morgan Guaranty), a wholly owned subsidiary of J. P. Morgan & Co., Inc. The banks named as defendants in the actions below, in addition to Morgan Guaranty are Citibank, N. A., The Sanwa Bank, Ltd., The Chase Manhattan Bank, N. A., Chemical Bank, Irving Trust Company, Marine Midland Bank, Bankers Trust Company, Manufacturers Hanover Trust Company and The Bank of New York. The settlement also applies to a number of other banks that had been major lenders to Grant, because the suits below were brought against Morgan Guaranty both individually and as agent for these banks and also because the loan agreements among the banks and Grant provide for the sharing of obligations and recoveries on the loans to Grant
 
 
 [2]
 Federal securities and state common law claims asserted against a number of defendants, including certain officers and directors of Grant and Grant's auditors, are not involved in the settlement. In addition, claims against Mr. Peterkin that do not relate to insider trading (Count III of the consolidated amended complaint) are not included in the settlement. Finally, the settlement does not affect claims against Chase Manhattan as Indenture Trustee for Grant's 4 3/4% Debentures, see note 8, infra, or claims asserted in Grant's bankruptcy proceedings on behalf of present debenture holders
 
 
 [3]
 This was deposited in an interest-bearing account and by the date of oral argument had increased to approximately $3.5 million
 
 
 [4]
 For example, the banks agreed to the granting of a senior security interest to Grant's vendors in early 1975, extended the maturity of the revolving credit agreement from June 2, 1975, to March 31, 1976, permitted the early repayment of loans due to a number of small banks, and subordinated payments of $300,000,000 of the outstanding bank loans to the payment of Grant's vendors. The last action was taken less than a month before Grant filed its Chapter XI petition. Naturally the objectors place a quite different interpretation upon those actions
 
 
 [5]
 The Bankruptcy Court defined equitable subordination as requiring proof that "the claimant sought to be subordinated (a) has acted in a fiduciary capacity; (b) has breached a fiduciary duty; [and] (c) that breach resulted in detriment to those claimants to whom a duty was owed," In re W. T. Grant Co., 4 B.R. 53, 74 (Bkrtcy.N.Y.1980). See Pepper v. Litton, 308 U.S. 295, 306-07, 60 S.Ct. 238, 245, 84 L.Ed. 281 (1939) ("The essence of the [equitable subordination] test is whether or not under all the circumstances the transaction carries the earmarks of an arm's length bargain.")
 
 
 [6]
 The trustee was assisted by the law firm of Weil, Gotshal & Manges and the accounting firm of Price Waterhouse & Co
 
 
 [7]
 On March 20, 1976, Bankruptcy Judge Galgay ordered that various of Grant's business records be preserved and made available to counsel for the plaintiffs below; Grant's employees also were enjoined from disposing of or destroying any of these documents
 
 
 [8]
 These were holders of Grant's 4 3/4% convertible subordinated debentures due 1996 ($92,507,000 face amount outstanding) and 4% convertible subordinated debentures due 1990 ($834,000 face amount outstanding). The settlement covered only claims of persons then holding the debentures
 
 
 [9]
 Judge Duffy later extended the deadline for opting out as to states represented by Mr. Brewer whose pension funds had invested in Grant securities, but not as to other class members, until February 16, 1981
 
 
 [10]
 In addition to the January 19 motion, a letter by Mr. Brewer to Judge Duffy dated September 16, 1980, with copies to counsel for the plaintiffs and for the defendants in the Weinberger action, clearly raised the objections as to the inclusion of state law claims not previously pleaded and as to the making of class determination only as incident to a settlement considered below. Objections which have been brought to the attention of the court and of counsel for proponents of a settlement by counsel for objectors should not be disregarded simply because they do not precisely comply with the procedures for the filing of individual objections specified in the notice of settlement. See 3 Newberg, Class Actions Sec. 5660d (1977). In passing on settlements of class actions under F.R.Civ.P. 23 the judge should not regard himself as an umpire in typical adversary litigation. He sits also as a guardian for class members who have not received a notice or who lack the intellectual or financial resources to press objections, National Super Spuds v. New York Mercantile Exchange, 660 F.2d at 9, 20 (2nd Cir.1981) (citing cases); Mandujano v. Basic Vegetable Products, Inc., 541 F.2d 832, 834-36 (9 Cir. 1976). Here the judge evidently did consider all the objections, see 91 F.R.D. at 495 n.4 and the February 6 order, although erroneously believing he was not required to do so and accordingly not discussing many of them or doing so only conclusorily
 
 
 [11]
 Appellants also argue that the notice was defective because it did not state what proportion of the class's total loss the settlement fund represented. Appellees meet this by noting that any estimate as to class losses--much less individual losses--would have been highly speculative and more likely to hinder informed decision-making by class members than advance it
 
 
 [12]
 The Second Amended Complaint in Lewy served in March, 1979, named only Chase Manhattan, Morgan Guaranty and Citibank as defendants. The complaint, which relies on factual allegations almost identical to those in the consolidated amended complaint, asserts that the defendants "exercised dominance and control over the board of directors and management of Grant." p 9. In addition, the complaint alleges that the defendants "conceal[ed] negative facts concerning the financial condition and unlawful mismanagement of Grant" thus effecting a manipulation of the securities market. p 11. The complaint goes on to describe numerous acts allegedly committed in furtherance of defendants' conspiracy, dwelling principally upon those set out in the Weinberger/Panzirer papers. Like the consolidated amended complaint, the Lewy complaint asserts causes of action based on common law fraud, p 1, and on breach of fiduciary duties, paragraphs 1, 31. So far as we can tell, the Lewy action would require proof of fault identical to what would be demanded in the Weinberger/Panzirer cases
 
 
 [13]
 Appellants also allege that the notice was "substantially incorrect and seriously misleading" in a number of respects, Appellants' Br. in No. 81-7829, at 19-21. The defects cited by appellants either do not exist--owing to misreadings by appellants' counsel of the notice or other publicly filed documents--or are immaterial
 
 
 [14]
 The subsection provides, in pertinent part, that
 In any class action maintained under subdivision (b)(3), the court shall direct to the members of the class the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort.
 
 
 [15]
 Our holding regarding pendent party jurisdiction is also limited to the peculiar "alignment of parties and claims" involved here, namely, the joinder of plaintiffs in a settlement of an action involving Rule 10b-5 and state law claims. Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 might be read as discerning a congressional intent to preclude the joinder of mere holders of securities in Rule 10b-5 cases in federal court, because of a desire to prevent disruption of the nation's businesses and to reduce vexatious litigation, 421 U.S. at 739-49, 95 S.Ct. at 1927-31. Whatever the strength of this argument as to claims that are proceeding to litigation, it surely is inapplicable when, as here, extension of pendent party jurisdiction permits the comprehensive settlement of plaintiffs' claims, thus furthering the policies underlying Blue Chip Stamps. We need not now decide how Blue Chip Stamps would affect the assertion of pendent plaintiff jurisdiction in a case not involving a settlement
 
 
 [16]
 Cf. Rader v. Boyd, 252 F.2d 585, 587 (10 Cir. 1958) ("Parties may assuredly deal at arm's length for their mutual benefit without raising a confidential relationship between them.") In passing on a settlement we are "not to ... resolve unsettled legal questions", Carson v. American Brands Inc., 450 U.S. 79, 88 n.14, 101 S.Ct. 993, 998 n.14, 67 L.Ed.2d 59 (1981), which a theory of recovery based on breach of fiduciary duty by the lenders surely would be