Terence NEILAN, on behalf of himself
and all others similarly
situated, Plaintiffs,

v.

VALUE VACATIONS, INC., David Kols
and Norman Segal, d/b/a Value Vaca-
tions, Northwestern National Insurance
Company, Connecticut National Bank,
Arrow Air, Inc. and Southeast Bank,
N.A., Defendants.

No. 84 Civ. 6672 (LFM).

United States District Court,
S.D. New York.

Feb. 11, 1987.

See also, 603 F.Supp. 1227.

**432**

Thomas A. Dickerson, New York City, for plaintiffs.

Clayton P. Knowles, Jr., New York City, for defendants Value Vacations, David Kols and Northwestern Nat. Ins. Co.

Owen & Fennel by Ronald C. Minkoff, New York City, and Steel, Hector & Davis, Miami, Fla., for defendant Southeast Bank, N.A.

Skadden, Arps, Slate, Meagher & Flom by Erskine W. Henderson, New York City, for defendant Connecticut Nat. Bank.

## MEMORANDUM AND ORDER

MacMAHON, District Judge.

This memorandum will address numerous motions made by the parties to this action.

## BACKGROUND

This is a class action on behalf of consumers who purchased travel services from defendant, Value Vacations, Inc. ("Value"), consisting primarily of air transportation provided by defendant, Arrow Air, Inc. ("Arrow").

In February 1984, Value and Arrow filed a prospectus with the Civil Aeronautics Board ("CAB") seeking authorization to market a European vacation tour package called the "Value/Arrow 1984 Summer Program." The tour consisted of approximately 102 flights between American and European cities during the period May 1984 through January 1985. Pursuant to federal regulations, Value and Arrow entered into a depository agreement with defendant, Connecticut National Bank ("CNB"), and Value obtained a surety bond from defendant, Northwestern National Insurance Company ("Northwestern"). Arrow had an additional depository agreement with defendant, Southeast Bank, N.A. ("Southeast"), which it had maintained since 1981.

The purpose of the depository agreements was to provide escrow accounts to safeguard the consumers' funds. The intent of the arrangement was that consumers would pay Value for the tour. Value would deposit the consumers' funds with its depository bank, CNB, which, in turn, would forward them to Arrow's other depository bank, Southeast, together with instructions as to the particular flights to which the funds were to be allocated. After completion of a charter flight, Arrow would request payment from Southeast, and Southeast would transfer funds from Arrow's escrow account to its operating account.

Operations began in May 1984, and Arrow delivered 64 flights for Value's consumers through early August, at which time a disagreement between Value and Arrow resulted in the cancellation of the remaining 38 flights. The consumers who had paid for the now-cancelled flights sought refunds from Value. Value asked

CNB to return the funds, and CNB turned to Southeast which had only $16,000 remaining in Arrow's escrow account. Approximately $1.33 million which consumers had paid for future flights was missing.

This suit, originally brought in the Supreme Court of the State of New York, New York County, was removed to this court and certified as a class action pursuant to Rule 23, Fed.R.Civ.P.

Discovery has revealed what happened to the missing funds. During the charter operation, Arrow would consistently request as payment for a flight more money than CNB had sent to Southeast to cover that flight. Southeast would transfer the requested amount from Arrow's escrow account to Arrow's operating account without ascertaining whether the requested amount balanced with the amount sent as payment for a flight. As a result, Arrow was collecting as payment for past flights funds which were supposed to be used to pay for future flights.

## DISCUSSION

1. *Southeast's Motion to Remove Class Representative and Compel Notice by Publication.*

■ Southeast moves, pursuant to Rule 23(c)(1), (d)(3) and (4), Fed.R.Civ.P., to compel notice by publication and to remove Terence P. Neilan as class representative for his alleged failure to comply with an order to publish.

Plaintiffs have encountered difficulty notifying potential class members because many of them used their travel agent's address rather than their own. In order to resolve this problem, Judge Brieant, to whom this case was originally assigned, ordered that the direct mailing of notice be followed by publication. Rule 23 clearly provides that members of the class are entitled to the best notice practicable under the circumstances.[1]

1. *American Pipe & Const. Co. v. Utah,* 414 U.S. 538, 548, 94 S.Ct. 756, 763, 38 L.Ed.2d 713

Southeast contends that notice was never published. Plaintiffs argue that the publication of a proposed settlement in this action serves as sufficient notice to the consumers. We agree.

Notice has been sent, by direct mail, at great expense to as many consumers or their travel agents as can presently be identified. This was followed by publication of a proposed settlement. We think this sufficient notice. Further publication at this stage of the proceedings would be repetitious, costly, and serve no clear purpose.

2. *Southeast's Motion to Dismiss Sixth Cause of Action.*

■ Southeast moves, pursuant to Rule 12(b)(6), Fed.R.Civ.P., to dismiss the sixth cause of action of the amended complaint for failure to state a claim. The relevant portions of the sixth cause of action allege:

Upon information and belief, the damages sustained by the plaintiff and the class were the proximate result of the gross negligence of Southeast to include the following specific acts of negligence: failure to independently determine and establish all duties and obligations of escrow/depository banks as set forth in applicable federal statutes and regulations; failure to supervise and monitor the transactions of Value, Kols, Siegel and Arrow; failure to independently verify that all transactions of Value, Kols, Siegel and Arrow conformed to all applicable federal regulations, particularly, as related to the proper handling and disposition of consumer monies; failure to segregate and establish separate accounts by charter flight for all consumer monies received and disbursed; failure to inquire of CNB and Arrow as to the significance and purpose of flight allocation instructions set forth in wire transfers sent by CNB to Southeast and was otherwise negligent.

(1974).

Southeast asserts that the above allegation amounts to simple, not gross, negligence and should therefore be dismissed. We disagree. There is no requirement that gross negligence be alleged, and its inclusion here is mere surplusage.

"A complaint should not be dismissed for insufficiency unless it appears to be a certainty that plaintiff is entitled to no relief under any state of facts which could be proved in support of the claim."[2]

In determining whether a complaint states a claim upon which relief can be granted, "the issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claim."[3] We cannot say whether plaintiffs will ultimately succeed in proving gross negligence.

The sixth cause of action, although hardly a model of pleading, satisfies the minimal requirement of a "short and plain statement of the claim showing that the pleader is entitled to relief," as required by Rule 8(a)(2), Fed.R.Civ.P. Dismissal is therefore unwarranted.

### 3. *Plaintiffs' Motion for Partial Summary Judgment.*

■ Plaintiffs move, pursuant to Rule 56(a), Fed.R.Civ.P., for partial summary judgment against Southeast on the issue of liability as to the fifth and seventh causes of action of the amended complaint. The seventh cause of action alleges that Southeast violated the federal regulations governing air charters. The fifth cause of action alleges a breach of the fiduciary duties created by those same regulations.

Prior to undertaking this charter program, Value and Arrow were required to file a prospectus with the CAB. The prospectus provided that the Value/Arrow program was to be administered pursuant to 14 C.F.R. § 380.34(b)(2)(vii), which provides, in relevant part:

The direct air carrier and charter operator ... shall enter into an agreement with a designated bank, the terms of which shall provide that all deposits by charter participants paid to charter operators ... shall be deposited with and maintained by the bank subject to the following conditions: ... the bank shall maintain a separate accounting for each charter group.

Southeast, contending that § 380.34 does not apply to it because it was the depository bank for Arrow, not Value, argues that its agreement with Arrow is governed solely by 14 C.F.R. § 207.17(a)(4), which provides, in relevant part:

No air carrier shall perform any charter trip ... nor shall such air carrier accept any advance payment in connection with any such charter trip, unless there is on file with the Board a copy of a currently effective agreement made between said carrier and a designated bank, by the terms of which all sums payable in advance to the carrier by charterers ... shall be deposited with and maintained by the bank, as escrow holder, the agreement to be subject to the following conditions: ... The bank shall maintain a separate accounting for each charter flight.

The purpose of both regulations is identical, namely, to segregate and protect the consumers' funds. In 33 Fed.Reg. 3273, 3274 (1968), the CAB adopted the following rule:

The supplemental air carrier and tour operator shall enter into an agreement with a designated bank.... (i) Each tour participant shall pay for his deposit ... payable to such bank which shall maintain a separate account for each tour.

In 38 Fed.Reg. 20248 (1973), the CAB decided to require the air carrier to establish depository bank accounts in which consumer deposits would be separately accounted for by individual flight, saying at page 20253:

---

**2.** *Lipsky v. Commonwealth United Corp.,* 551 F.2d 887, 894 (2d Cir.1976).

**3.** *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974).

[T]he depository bank would be required to maintain a separate accounting for each charter flight with respect to which such advance payments had been received for escrow ... We shall adhere to the proposal to require banks to maintain a separate accounting for each charter flight.

Finally, in 42 Fed.Reg. 61412 (1977), the CAB addressed what is known in the charter business as "deficit spending:"

The use of funds collected from one group of participants to defray the expenses of another, usually an earlier, charter is one of the abuses this protection scheme is specifically designed to prevent. The specific intent of the "separate account" requirement is to prevent "deficit spending" for any charter unit, so that any shortage in, for example, money to pay the air carrier for a trip will be immediately brought to the charterer's attention.

The above history and plain language of both regulations make clear that a separate accounting for each flight was to be maintained by any depository bank involved in a charter operation.

Southeast acknowledges that the regulations require a separate accounting for each charter flight. Plaintiffs argue that Southeast failed to maintain a separate accounting of deposits received from CNB, and, therefore, Southeast is liable under the regulations.

There is no genuine issue of fact as to Southeast's failure to separately account for deposits received. Admitting that no such accounting was kept, Southeast argues that under the regulations it was not required to keep a separate accounting for deposits received, but only to separately account for funds sent to Arrow, which Southeast did.

The goal of the regulations was to protect consumers' deposits. The mechanism chosen to accomplish that goal was a detailed, separate, accounting by a bank of all consumers' funds. This means an accurate accounting of both receipts and disbursements. Indeed, it is difficult to envision an accurate accounting without a record of both receipts and disbursements. Southeast, had it used such a system, would have discovered quickly that Arrow was receiving excessive payments.

We conclude that the failure of Southeast to observe the procedures outlined in the federal regulations warrants summary judgment in favor of plaintiffs on the issue of liability as to the fifth and seventh causes of action of the amended complaint.

4. *The Proposed Settlement and Award of Partial Attorney's Fees.*

Plaintiffs and CNB move, pursuant to Rule 23(e), Fed.R.Civ.P., for approval of their proposed settlement. Rule 23(e) provides:

A class action shall not be dismissed or compromised without approval of the court, and notice of the proposed dismissal or compromise shall be given to all members of the class in such manner as the court directs.

We ordered, pursuant to Rule 23(e), that notice of the proposed settlement be mailed to all class members and that it be published in *The New York Times*. Plaintiffs and CNB have complied with our order.

The terms of the proposed settlement require CNB to: (1) establish a separate account, called "the Neilan Class Action Settlement Fund (the "settlement fund")," into which would be deposited all monies still held in escrow, amounting to approximately $700,000.00; (2) contribute an additional $50,000.00 to the settlement fund; (3) waive all claims for costs and attorney's fees incurred in this action; (4) absorb the costs of identifying class members, processing claim forms, and giving notice of the settlement to class members; and (5) cooperate with plaintiffs' counsel in preparing for trial by producing relevant documents and making employees available as witnesses.[4]

4. *Stipulation of Compromise and Settlement* ¶¶ 7, 9 and 10.

In consideration for CNB's contributions and cooperation, plaintiffs agree that "the settlement fund to be paid by CNB in accordance with this stipulation shall be all that CNB shall be required to pay in connection with any of the matters alleged, or which could have been alleged, in the Complaint or Amended Complaint in this action or any subsequent action." [5] Plaintiffs also agree to release the non-settling defendants from any liability that is the responsibility of CNB.

A settlement proposal must be "fair, adequate and reasonable." [6] A determination as to its adequacy should be based upon a comparison of "the terms of the compromise with the likely rewards of litigation." [7] The settlement must be the result of arms' length negotiations, and plaintiffs' attorney must possess experience and ability and have engaged in sufficient discovery to effectively represent the interests of the class.[8]

We are guided by the following factors in passing upon the adequacy of a class action settlement: (1) the complexity, expense, and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; and (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.[9]

The proponents of the settlement have the initial burden of proving "that the settlement was reached as a result of arm's length negotiations; that they are represented by counsel experienced in similar cases; that there has been sufficient discovery to enable counsel to act intelligently; and that the number of objectants or the relative size of their interests is small." [10] We now consider the propriety of the proposed settlement here in light of the above standards.

This action, because of the size of the class and the difficulty in tracing the flow of the consumers' funds, has proven to be both complex and expensive. Approval of this partial settlement would save many more months of discovery and tens of thousands of dollars in costs.

Class members have expressed little opposition to the proposed settlement. We have received, in letter form, four objections to the proposed settlement—a small number in light of the class size of almost ten thousand. Additionally, the objections are addressed not to the settlement itself but to the request by plaintiffs' attorney for an interim award of fees. We find, therefore, that the overwhelming majority of the class favors settlement.

During the more than two years in which this action has been pending, extensive discovery has been conducted; over 500 exhibits were marked during the taking of numerous depositions, and dozens of requests were made for the production of documents and answers to interrogatories. These discovery efforts have resulted in the review and analysis of tens of thousands of documents which led plaintiffs' counsel to conclude that the risks of proving liability as to CNB are great and outweighed by the benefits of the proposed settlement.

5. *Id.* at ¶ 12.

6. *Weinberger v. Kendrick,* 698 F.2d 61, 73 (2d Cir.1982), *cert. denied,* 464 U.S. 818, 104 S.Ct. 77, 78 L.Ed.2d 89 (1983).

7. *Weinberger, supra,* 698 F.2d at 73, quoting *Protective Comm. for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson,* 390 U.S. 414, 424–25, 88 S.Ct. 1157, 1163–64, 20 L.Ed.2d 1 (1968).

8. *Weinberger, supra,* 698 F.2d at 74. *See also City of Detroit v. Grinnell Corp.,* 495 F.2d 448, 463–66 (2d Cir.1974) (*Grinnell I*).

9. *Id.* at 463.

10. *In re Baldwin-United Corp.,* 607 F.Supp. 1312, 1320 (S.D.N.Y.1985), citing *In re Shopping Carts Antitrust Litigation* MDL No. 451, 1984–1 Trade Cas. (CCH) § 65,823 (S.D.N.Y.1983) [Available on WESTLAW, DCT database].

Affidavits in support of the proposed settlement show that both plaintiffs and CNB are represented by attorneys experienced in this type of litigation and that settlement was reached as a result of arms' length negotiations over a period of six months. We see no evidence of any collusion; nor is there any reason to doubt the judgment of plaintiffs' attorney that settlement is preferable to the continued risks and expense of litigation. The provisions of the proposed settlement are within an acceptable range of reasonableness in light of the best possible recovery balanced against the inherent risks of litigation.

■ The final matter before us is an application for partial attorney's fees and disbursements. Counsel for plaintiffs has requested $54,000.000 as partial payment for legal services and $23,546.51 for reimbursement of expenses.

The amount of attorney's fees in a class action is calculated by multiplying the number of hours the attorney has worked on the case by the hourly rate normally charged by attorneys of comparable skill in the area. Once this base is established, other factors, such as "the risks of litigation," complexity of issues, and skill of the attorney, can be taken into account to determine a fee.[11] This is known as the "lodestar approach" to calculating attorney's fees.

The detailed affidavit in support of the request here shows that 1,365.1 hours were spent by counsel in prosecuting this action, with an additional 429.5 hours for paralegal work. Counsel requests compensation at the rate of $150.00 per hour for himself and $35.00 per hour for paralegal services. The total fee, therefore, would be $219,797.50.

Counsel presently seeks a fee of $54,000.00, or 22% of the "lodestar" total. His stated reason for seeking partial payment is because prosecution of this action will continue, and he will seek additional fees should more funds be generated for the class through further settlement or judgment.

Plaintiffs' counsel has struggled long and hard against the determined opposition of defendants' able counsel. Extensive discovery has been undertaken and numerous motions made. Intensive settlement negotiations have resulted in a fair compromise of some of the claims. In short, plaintiffs' counsel has expended considerable time and effort in service to the class.

The $54,000.00 requested represents less than 10% of the approximately $700,000.00 settlement negotiated between plaintiffs and CNB. Plaintiffs' counsel also seeks $23,546.51 as reimbursement for expenses incurred in this litigation and has submitted a detailed, factual, affidavit in support of his request.

In light of the above, we believe counsel's request, both for fees and expenses, is fair and reasonable.

## CONCLUSION

Accordingly:

(1) Defendant Southeast's motion to compel further publication and to remove Terence P. Neilan as class representative is denied;

(2) Southeast's motion to dismiss the sixth cause of action of the amended complaint is denied;

(3) Plaintiffs' motion for partial summary judgment against Southeast on the issue of liability as to the fifth and seventh causes of action of the amended complaint is granted; and

(4) The proposed settlement between plaintiffs and defendant CNB is approved. The request of plaintiffs' counsel for partial fees and expenses is granted to the extent that the settlement fund is assessed $54,000.00 for attorney's fees and $23,546.51 for reimbursement of expenses.

So ordered.

11. *New York Ass'n for Retarded Children v. Carey,* 711 F.2d 1136, 1140 (2d Cir.1983); *City of* *Detroit v. Grinnell Corp.,* 560 F.2d 1093, 1098 (2d Cir.1977) (*Grinnell II*).