**In re UNION CARBIDE CORPORATION CONSUMER PRODUCTS BUSINESS SECURITIES LITIGATION.**

**No. MDL 692 (CLB).**

United States District Court, S.D. New York.

July 13, 1989.

See also 676 F.Supp. 458.

Jerome Congress, David J. Bershad, Sol Schriber, Robert Wallner, Milberg, Weiss, Bershad, Specthire & Lereach, New York City, David H. Weinstein, Kohn, Savett, Klein & Graft, Philadelphia, Pa., Daniel Kurasner, Wolf, Haldenstein, Adler, Freeman & Herz, Lawrence A. Sucharow, Goodkind, Labaton & Rudoff, New York City, for plaintiffs.

Raymond Falls, Kevin Burke, Robert Butler, Cahill, Gordon & Reindell, New York City, for defendants Union Carbide and the Officers and Directors.

Douglas Brandon, Davis, Polk & Wardwell, New York City, for defendant Morgan Stanley.

## MEMORANDUM AND ORDER

[Findings and Conclusions re Fairness of Proposed Settlement]

BRIEANT, Chief Judge.

Class plaintiffs petition the Court pursuant to Fed.R.Civ.P. 23(e) for judicial approval of a proposed settlement between the class members and defendants Union Carbide Corporation (Union Carbide or the Company) and Morgan Stanley & Co. (Morgan Stanley) as set forth in the Stipulation of Settlement dated December 22, 1988. A public hearing was held on March 20, 1989, and this matter was fully submitted for decision on April 24, 1989. Familiarity of the reader with the prior proceedings in this case is assumed.

This litigation is a consolidation of four cases which were originally brought during 1986 arising out of Union Carbide's announced plan to sell its Consumer Products businesses and distribute a portion of the proceeds to holders of Rights, as a part of its attempt to avoid a takeover of the Company by the GAF Corporation. The four actions are *Scott v. Union Carbide*, Civ. No. 86-4177 (CLB) (S.D.N.Y.), *Abrevaya, et al. v. Union Carbide*, 86-4318 (CLB) (S.D.N.Y.), *Ring v. Union Carbide*, Civ. No.

86–2897 (W.D.Pa.), and *Stevens v. Union Carbide*, Civ. No. 86–6264 (N.D.Ill.).

## Facts and Procedural History

Plaintiffs brought this litigation as a class action under provisions of the federal securities law and pendent state law on behalf of all persons who received the original 31 million Rights from Union Carbide on March 3, 1986, or subsequently purchased such Rights on the open market, and who continue to hold such Rights to their detriment allegedly as a result of the conduct charged. The Consolidated Amended Complaint alleges various forms of violation by Union Carbide, its officers and directors, and Morgan Stanley, Union Carbide's investment banker, in connection with the disclosure and implementation of Union Carbide's plan to sell its Consumer Products businesses and distribute a portion of the proceeds to those who received the Rights.

Specifically, plaintiffs claim that Union Carbide and its directors made materially misleading representations to the class members and the investing public concerning the Rights, in publishing a range of $2 billion to $2.5 billion as estimated pre-tax sale proceeds, an amount which allegedly was known by Union Carbide (and Morgan Stanley) to be falsely inflated and unrealistic.

Plaintiffs further allege that defendants made deceptive statements in violation of various provisions of the federal securities laws. Union Carbide allegedly failed to disclose that the Consumer Products businesses would be sold on restrictive terms which included a covenant for the continued employment of certain Union Carbide executives and employees and a required exclusive long-term supply contract with Union Carbide, claimed by plaintiffs to be material omissions. These restrictions, plaintiffs claim, decreased the sales value of the businesses and thereby breached Union Carbide's self-imposed promise or its "duty" to maintain competitive bidding and to obtain the maximum sales proceeds for the Rightsholders, and otherwise deal in good faith with respect to their interests.

Further, plaintiffs argue that the Rights should have been registered under the Securities Act of 1933, and thus that Union Carbide engaged in the unlawful sale of unregistered securities.

In addition, plaintiffs allege that Union Carbide thereafter breached its contract with the Rightsholders, and failed to make payments consistent with the terms of the special dividend which had been declared for the benefit of the Rightsholders, by making improper deductions from the amount received on the sale of the Consumer Products businesses in order to cover potential claims by the Company's dividend equivalent holders before distributing the net proceeds to the Rightsholders (*See* discussion, *infra*, of the *Nicholson* litigation).

Plaintiffs also contest certain deductions from the sale proceeds made by Union Carbide as "liabilities and expenses," and contest the failure to pay Rightsholders any interest on this sum for the time period after sale and before distribution.

The Rights, which were traded on the NYSE, opened at $40 per Right. Within seven weeks, the price of the Rights dropped to $33, the price at which they traded at the end of the class period (4/21/86).

## Terms of Settlement

The Stipulation of Settlement (Stipulation) requires a total of $31,730,917 to be paid to the class (the Settlement Fund). In consideration of the settlement, on December 22, 1988, Union Carbide paid $31,730,917 to plaintiffs' steering committee as escrow agent for the class, said to represent a payment equivalent to $1.00 per outstanding right minus estimated attorneys' fees and expenses. This sum is currently earning interest, which will be added to the Settlement Fund to be distributed to class members after deducting counsel fees and expenses. The Stipulation provides that the settlement of claims will not be conditional on court approval of any particular allocation or distribution plan for the Settlement Fund.

Mailed notice and publication notice were provided to the members of the class in compliance with this Court's order of Janu-

ary 11, 1989. Over 70,000 notices were mailed on January 27, 1989, and summary notice was initially published in the national edition of the *Wall Street Journal* on January 30. In addition, summary notice was published in the national editions of the *Wall Street Journal* and *New York Times* on February 3 and 10, 1989.

*Allocation and Distribution*

Paragraph 6 of the Stipulation provides for certification of the litigation as a class action on behalf of a class defined as follows:

[A]ll persons (other than the defendants and members of their immediate families and entities or trusts which they control but including persons who are not individually named as defendants but who are participants in Union Carbide's Dividend Reinvestment and Stock Ownership Program whose Rights are held for their benefit in the name of Union Carbide) who received Union Carbide Corporation Rights issued in connection with the anticipated sale in 1986 of Union Carbide's Consumer Products businesses in the initial distribution of the Rights, or who purchased the Rights on or before April 21, 1986, or who own Rights on the Record Date set forth in the Notice [February 15, 1989].

The Settlement Fund less the legal fees and expenses of class counsel allowed by the Court, including all expenses incurred in connection with the administration and distribution of the settlement and the notice to class members, will be allocated to claimants as follows:

(a) *Category I claimants* (owners of Rights as of February 15, 1989)—may claim up to $.85 per Right.

$.50 for each Right owned as of Record Date = $15,865,459.50 (No attorney's fees or expenses will be deducted from this amount).

If funds remain after all Category I claimants receive a minimum of $.50 per Right, ½ of the balance will be distributed proportionally to Category I claimants, for a total of up to $.85 per Right. The remaining ½ will be used as the distribution fund for Category II and III claimants.

(b) *Category II claimants* (claimants who received Rights when initially distributed to Union Carbide shareholders)—to receive amount of recognized loss.

Recognized loss = $1.00 for each Right received by claimant at the initial distribution, except (1) if the Right was sold for more than $38.25, the recognized loss = $39.25 less the actual sales price for that Right; and (2) with respect to any Right received at initial distribution and still owned by claimant, thereby making claimant a Category I claimant with respect to that Right, the recognized loss = $.50.

(c) *Category III claimants* (claimants who purchased Rights subsequent to their initial distribution, and on or before 4/21/86)—to receive amount of recognized loss.

Recognized loss = amount paid for Right less [ (1) amounts previously received by claimant from Union Carbide for the Right + (2) amount received by claimant on the sale of the Right or $.50 for a Right that has not been sold and as to which claimant is a Category I claimant.]

Thus, the amount distributed to Category II and III claimants would be the amount remaining in the Settlement Fund after payment of the amount set aside for Category I claimants and the amount paid in attorneys' fees and expenses as allowed by the Court. The amount distributed to Category II and III claimants would be allocated on a pro rata basis based on each claimant's recognized loss as defined above.

Upon final approval of the settlement, all defendants will be forever released from liability for any of the acts, omissions, or misrepresentations alleged in the complaint, and Rightsholders will be barred from making any claims for further distribution from Union Carbide in connection with the Rights. The action would be dismissed as to all defendants with prejudice.

*Analysis of the Settlement*

This settlement is before the Court pursuant to Fed.R.Civ.P. 23(e) which provides that "a class action shall not be dismissed or compromised without the approval of

the court. . . ." In exercising its discretion under Rule 23(e), the Court must analyze the evidence and circumstances before it independently and objectively to determine whether the settlement is in the best interests of the class. *National Super Spuds, Inc. v. New York Mercantile Exchange,* 660 F.2d 9 (2d Cir.1981); *Zients v. La-Morte,* 459 F.2d 628 (2d Cir.1972).

In determining whether a class settlement should be approved, the court must decide whether the interests of the class as a whole are better served if the litigation is resolved by the settlement rather than pursued. The settlement must be fair, reasonable, and adequate under the circumstances, *Weinberger v. Kendrick,* 698 F.2d 61, 73 (2d Cir.1982), *cert. denied,* 464 U.S. 818, 104 S.Ct. 77, 78 L.Ed.2d 89 (1983), upon a comparison of "the terms of the compromise with the likely rewards of litigation." *Id.* at 73. As stated in *City of Detroit v. Grinnell Corp.,* 495 F.2d 448 (2d Cir.1974), the relevant factors for the court to consider are:

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; [and] (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*Id.* at 463 (citations omitted).

In evaluating the settlement of complex class actions, the courts have long recognized that such litigation "is notably difficult and notoriously uncertain," *Lewis v. Newman,* 59 F.R.D. 525, 528 (S.D.N.Y. 1973), and that compromise is particularly appropriate. The law favors settlements by the parties rather than by court disposition, *Newman v. Stein,* 464 F.2d 689 (2d Cir.), *cert. denied,* 409 U.S. 1039, 93 S.Ct.

521, 34 L.Ed.2d 488 (1972), and the central question before this Court is whether the proposed compromise is reasonable when compared to the likely results of litigation. Reasonableness is not a standard susceptible to a mathematical equation yielding a sum certain. Rather, "in any case, there is range of reasonableness with respect to a settlement." *Id.* at 693.

The Court of Appeals has held that a settlement can be approved even though the benefits amount to a small percentage of the recovery sought. *City of Detroit v. Grinnell,* 495 F.2d at 455. The essence of settlement is compromise. In *In re "Agent Orange" Product Liability Litigation,* 597 F.Supp. 740 (E.D.N.Y.1984), Chief Judge Weinstein stated:

> The dollar amount of the settlement by itself is not decisive in the fairness determination. The fact that the settlement amount may equal but a fraction of potential recovery does not render the settlement inadequate. Dollar amounts are judged not in comparison with the possible recovery in the best of all possible worlds, but rather in light of the strengths and weaknesses of plaintiffs' case.

*Id.* at 762.

Courts have also examined the "negotiating process by which the settlement was reached." *Weinberger v. Kendrick,* 698 F.2d at 74. Courts have focused on whether the settlement was achieved through "arm's length negotiations" by counsel who have "the experience and ability . . . necessary to effective representation of the class's interests." *Id.* A presumption of correctness is said to attach to a class settlement reached in arms-length negotiations between experienced, capable counsel after meaningful discovery. *See, e.g., Wellman v. Dickinson,* 497 F.Supp. 824, 830 (S.D.N.Y.1980), *aff'd,* 647 F.2d 163 (2d Cir.1981). The Court is satisfied that the attorneys representing the plaintiff class thoroughly analyzed all available legal theories, and entered into the Stipulation of Settlement following arm's length negotiations with defendants' counsel.

Plaintiffs' counsel assert that the settlement is favorable to the class in light of the numerous risks and uncertainties that confronted plaintiffs in this litigation. In support of the proposed settlement, Mr. Congress notes that there were only two objections to the settlement filed, out of 70,000 copies of notice mailed, and that plaintiffs have received exclusion requests covering only .05% of the Rights which are currently outstanding (Category I claims), .06% of the Rights which were received on the initial distribution of the Rights (Category II claims), and .0035% of all the Rights traded on the open market during the period when the deception is alleged. Out of the 70,000 members of the class who received the notice, 221 elected to opt out of the settlement, or about .3%.

Thus, the settlement class members, whose interests are at stake, have expressed a minimal amount of opposition to the proposed compromise of their claims against Union Carbide. The Court does not perceive this response as a ratification of the settlement. However, any plaintiff who believed that he could recover a larger sum by continuing to press his case should be expected to have opted out and proceeded individually or by motion for certification of a sub-class consisting of only members of his particular claimant category.

Since important claims had already been dismissed by this Court as to defendants First Boston, Dudley and Egler, and many complex factual issues would be presented at trial, class counsel believe and represent that the settlement and proposed distribution plan are fair to all categories of claimants, and reflect a reasonable evaluation of the relative probabilities of a recovery by each if a trial were held. The following issues of material fact, and perhaps others, are believed to require a trial:

1. Whether the supply contracts required by Union Carbide materially affected the potential market value of the Consumer Product businesses, or discouraged potential bidders, and whether the fact that these contracts and other restrictions were to be imposed on the future management of prospective purchasers would be con-

sidered significant by a reasonable investor in the Rights (see, e.g., Tr. of April 28, 1987 Hearing, at 79, 82);

2. Whether the use of qualifying language such as "[a]ctual pre-tax sale proceeds may vary from these estimates based upon the final terms of sale. There can be no assurance that pre-tax sale proceeds will be in the range of $2.0 to $2.5 billion or that the net book value of the businesses to be sold will equal $1.1 billion," contained in the January 23, 1986 Union Carbide Form 8K, and the January 3, 1986 Supplement to Offer to Purchase, would be sufficient to "bespeak caution" to the reasonable investor;

3. The extent to which the existence and number of outstanding Union Carbide stock options and convertible debentures as of December 1985, and the potential dilution created thereby, were disclosed to or known by the market on January 3, 1986;

4. Whether Union Carbide sold the Consumer Products businesses by a competitive bidding process, including whether the process actually used was designed to and did provide all prospective bidders with fair access to any and all information necessary to prepare their bids, and whether the meetings and telephone conversations between the Home and Automotive Division management and First Boston representatives had an adverse impact on the bidding process or the price received for the Home and Automotive business;

5. Whether Union Carbide in fact represented that it would conduct a competitive bidding process, taking into consideration its accompanying statement, previously characterized by this Court as "doublespeak," that its objective in selling the Consumer Products businesses was to obtain "maximum value for our shareholders while acting in the best interests of employees, customers, and suppliers of these businesses and the communities where they operate" (January 2nd Letter to Shareholders, at 3; January 3rd Supplement, at 3).

6. Whether Union Carbide and its directors relied in good faith on the advice of Morgan Stanley in estimating that the net pretax sale proceeds from the sale of the

Consumer Products businesses would likely range from $2.0 billion to $2.5 billion, and whether this estimate had a good faith, non-reckless basis;

7. Whether any bidder offered a higher price for the Home and Automotive Division than did First Boston; prospective purchasers were discouraged from bidding by the announced range of possible proceeds; or any bidder or other person, if as fully informed as First Boston allegedly was, would have paid more for the Consumer Products businesses than Union Carbide in fact received;

8. Whether arrangements for supply contracts with the purchaser of the Home and Automotive business were more valuable to Union Carbide's shareholders than a maximum payment on the Rights would have been;

9. Whether Union Carbide accurately disclosed that "expenses, debts, liabilities and obligations of, and claims against, the Company in connection with" the sale of the Consumer Products businesses would be deducted from the amount that holders of the Rights would receive;

10. Whether the expenses, retained liabilities and book value that Union Carbide deducted from the gross sale proceeds in determining the amount to be distributed to Rightsholders were all within the contemplation of the Rights Agreement or other contractual agreements benefiting the alleged class, and whether any of these deductions were thereafter calculated or determined improperly or with the intention to defraud;

11. Whether there existed a preconceived fraudulent plan on the part of Union Carbide or its directors to corrupt the bidding process, to make material misrepresentations or omissions, or to commit any of the other acts of which plaintiffs complain;

12. Whether any act or conduct of Union Carbide or its directors injured any of the plaintiffs in any quantifiable amount.

The foregoing dispassionate listing of issues to be tried, as to all of which the plaintiff class has the burden of persuasion

(since scienter is never presumed) tells the reader, eloquently, of many of the litigation risks facing the plaintiff class. These risks include the factual difficulties of proving plaintiffs' claims, the legal difficulties discussed in this Court's opinions of July 31 and September 4, 1987, the risk of an unfavorable judgment in the *Nicholson* case (discussed *infra*), and the difficulty in proving damages.

### The Nicholson Litigation

■ A potential obstacle to the settlement is posed by the uncertainties surrounding the unrelated dividend equivalent holders' claims now in litigation against Union Carbide. The Rightsholders claim that $27 million was wrongfully withheld from their promised distribution because it might have to be paid over to the dividend equivalent holders.

There is presently pending, in Supreme Court, New York County, a non-jury action entitled *Union Carbide Corp. v. W.B. Nicholson, et al.*, Index No. 13518/86 (Wilk, J.) (*see* Congress Affidavit, pp. 53–59, for a more detailed description of the *Nicholson* litigation). In that action against a defendant class of dividend equivalent holders, Union Carbide seeks a declaratory judgment as to whether or not it is obligated to make a payment to holders of "dividend equivalents" in an amount equal, per dividend equivalent, to the amount paid to Rightsholders, per Right. Although no Rights were ever issued to the *Nicholson* class, Union Carbide deducted $.85 per Right (for a total of $27 million) from the distributions which it would otherwise have made to Rightsholders, pending determination of the *Nicholson* case.

If this proposed settlement is approved, all claims by members of the class to obtain all or any portion of the $27 million withheld for the dividend equivalent holders' disputed claim will be surrendered. If Union Carbide prevails in *Nicholson*, the class members may possibly receive the $.85 per Right even if they take nothing in this lawsuit.

The class members alleged in their complaints in these consolidated actions that the $27 million deduction was improper

even if the dividend equivalent holders are entitled to payment, since Union Carbide and its directors had represented that only the Rightsholders would be entitled to participate in the special dividend. In response, Union Carbide argues that it is obligated to pay only the difference between net sales proceeds and the book value of the Consumer Products businesses, and that any payments to the dividend equivalent holders are deductible from the sales price in determining sales proceeds as a cost of selling the Consumer Products businesses.

The *Nicholson* case involves interpretation of employee incentive compensation plans established by Union Carbide in 1959 and 1965. The 1959 Plan provides in Article I that

> The Board of Directors of the Corporation may from time to time ... grant Incentive Awards to officers and employees ..., such Incentive Awards to be in the form of either (a) Options to purchase capital stock of the Corporation, or (b) Dividend Equivalents with an accompanying Option to purchase an equal number of shares or capital stock of the Corporation, or (c) Dividend Equivalents only.

The 1965 Plan is similar, but omits clause (c).

> The Plans define dividend equivalents as:
> [T]he right to receive for a specified period of time cash payments from the Corporation or a Subsidiary equivalent in value to dividends (other than stock dividends) paid during such period on one share of stock of the Corporation.

*See* Congress Supplemental Affidavit, Exh. A, Art. I of the Plans.

Since the distribution to the Rightsholders was made pursuant to the express declaration by the Union Carbide board of a "special dividend," the dividend equivalent holders take the position that they are entitled by Article I to be paid the same amount, per dividend equivalent, that the Rightsholders were to receive, per Right. Union Carbide, on the other hand, asserts that the "special dividend" declared on January 2, 1986 was not the type of dividend in

which the dividend equivalent holders were intended to participate. Rather, Union Carbide argues that the distribution to the Rightsholders was a "special distribution" within the meaning of the relevant Plans, and therefore is governed by Article V of the Plans.

Article V of the 1959 Plan provides:

> In the event of any change in capital, shares of capital stock *or any special distribution to the Stockholders*, the Board of Directors shall make equitable adjustments in the number of Dividend Equivalents then outstanding and which may thereafter be granted.

(Emphasis added). The 1965 Plan includes a similar provision. Union Carbide contends that, under the above provision, the dividend equivalent holders are entitled at most to an equitable adjustment in the number of their dividend equivalents. In addition, Union Carbide stresses the clause that Union Carbide "shall have authority to interpret and administer this Plan and to determine the provisions of Incentive Awards subject to the conditions of this Plan." 1959 Plan, Art. II. The 1965 Plan contains a similar provision.

In response, Mr. Frederick Davis of Patterson Belknap Webb & Tyler, counsel for the dividend equivalent holders in the *Nicholson* case, asserts that the defendants have a strong argument that, under the Dividend Equivalent Agreement, the Rights distribution was a dividend. Thus, this distribution of Rights triggered the obligation to issue such Rights also to the dividend equivalent holders. Mr. Davis further argues that it was the intention of the draftsmen, as will be shown by parole evidence at trial, to include such a dividend within the scope of that Agreement (*see* Letter of Frederick Davis to Chief Judge Brieant, dated April 18, 1989, for a more detailed description of defendants' arguments).

Alternatively, the dividend equivalent holders may argue that they are entitled to a substantial upward adjustment in the number of their dividend equivalents. The grounds for this contention would include (a) the language of the Plans as quoted

above; and (b) the fact that the earnings potential of the Company (and hence the dividend-producing potential) has been dramatically reduced by the sale of the Consumer Products businesses, since the shareholders received compensation (through the distribution to the Rightsholders), while the dividend equivalent holders received nothing.

Prior to agreeing on the terms of the settlement, counsel for the plaintiffs in this action met with Mr. Davis to see whether a global settlement would be possible. Mr. Davis informed plaintiffs' counsel that his clients had no interest in such a settlement because of their strong belief that their claims against Union Carbide would be successful. Mr. Davis also rejected direct settlement overtures from Charles C. Platt, Esq., acting as attorney for the Grant S. Lewis P.C. Pension Trust, a class member objecting to the proposed settlement.

This Court will resist any temptation to opine on the merits or possible ultimate resolution of the *Nicholson* litigation, since its familiarity with that action is limited to letters from counsel for the parties involved in that case, and does not include any consideration of the extensive testimony or documentary evidence to be offered at the trial of that action. This Court does not mean to prejudge the issues underlying the *Nicholson* case, but must consider the possibilities for recovery in that litigation to assess whether settlement of the consolidated actions is in the best interests of the class. That is so because when and if Union Carbide wins the *Nicholson* case, our class members will be almost as well off as they would be if they did not settle.

The outcome of Union Carbide's declaratory judgment action against the dividend equivalent holders is uncertain because of the ambiguous language in the letter announcing the Rights distribution. Thus, a substantial issue exists as to whether the provisions of Article I or Article V of the Plans are operative. It is, of course, difficult, to predict the outcome of any lawsuit.

This Court is not persuaded that it is more likely that the defendant class in *Nicholson* will prevail on the merits. Proba-

bly, in light of the vagaries and risks of any litigation, and particularly the risk of an adverse outcome, the dividend equivalent holders in the *Nicholson* case and Union Carbide will choose to settle the action as the trial progresses. If a settlement occurred based on a lump sum, as most such cases are settled, it would be difficult to determine how much Union Carbide paid to the dividend equivalent holders in return for the relinquishment of their claims to an upward adjustment in the number of their dividend equivalents, as opposed to the amount paid to extinguish the claim that the dividend equivalent holders are entitled to receive a distribution of Rights identical to that of the shareholders. In any event, Union Carbide would presumably seek to deduct most or all of any amount paid to the dividend equivalent holders from the Rightsholders' distribution. Indeed, during informal settlement discussions with this Court, Union Carbide's counsel indicated that consideration of extinguishing any residuary interest of the Rightsholders in the $27 million, if the Company wins *Nicholson*, had been factored into its consideration of the amount it would be willing to offer to settle the instant action.

If counsel for the *Nicholson* defendants are correct in their analysis, there might be nothing left of the $27 million withheld for the class members in this case. On the other hand, if Union Carbide were to be completely successful in its New York State action, significant delay would occur before the class members would receive any part of the money withheld. Trial of the *Nicholson* case began on June 5, 1989, but has been recessed until September. Assuming the trial is concluded this year, in a letter dated April 20, 1989, Union Carbide's counsel, William A. Krohley of Kelley Drye & Warren, has assured this Court that post-trial briefs are likely to be permitted. Thereafter, Justice Wilk must prepare his findings and conclusions. The nature and size of the subject matter of the *Nicholson* litigation suggests to us that two stages of appellate review on the part of the losing party must be regarded as inevitable.

Absent a settlement in *Nicholson,* and considering the potential for litigation delay, plaintiffs would not expect a definitive resolution of that matter, and subsequent payment of all or part of the $27 withheld from the Rightsholders, in less than two years.

While it is true that the impact of the dividend holders' claims remains unsettled, plaintiffs' counsel believe that the Court, acting to protect the absent class members, should not reject a settlement equivalent of $1 per Right now, with a minimum guaranteed payment of $.50, plus interest, for the chance possibly to receive $.85 per Right a few years from now if all goes well in *Nicholson.* In light of the foregoing analysis, this Court concludes that a prudent businessman would be well-advised to settle this action on a basis which includes, among other things, a release to Union Carbide of the Rightsholders' claims to the money at issue in the dividend equivalent holders' action, essentially because of the litigation uncertainties and the prospects for significant delay.

*Objections to Settlement*

The Court has received only two objections to the settlement from class members who hold a total of 1,000 Rights out of the 31,730,917 Rights outstanding, as well as a Notice of Grievance from a person who is not a member of the class. These are discussed below:

■ William Leighton, appearing *pro se,* filed a Notice of Grievance on March 8, 1989. Mr. Leighton is admittedly not a Rightsholder and is therefore not a class member. He lacks standing to assert his objection. On this point, it is of no relevance whether Mr. Leighton is correctly characterized as a "habitual *pro se* litigant whose claims ... [are] often conclusory and lacking in legal merit." *Leighton v. Paramount Pictures Corp.,* 340 F.2d 859, 861 (2d Cir.1965). Only class members and the defendants will be bound by these proceedings and only they have a financial interest in the outcome of this litigation. Accordingly, his Notice of Grievance will be disregarded.

■ Michael Pavelek, the owner of 700 Rights on initial issue, filed an objection to the proposed allocation, but not to the amount of the settlement. Mr. Pavelek claims that the proposed allocation of the Settlement Fund does not compensate Rightsholders in proportion to their losses because those who held onto their Rights lost more money than those who sold. Mr. Pavelek asserts that the amount of settlement sought seems to approximate only the amount allegedly wrongfully deducted from the proceeds of the sale of the Consumer Products businesses, while not recompensing the greater amount lost through compelling the purchaser to accept long-term supply agreements, thereby lowering the businesses' sale value.

Mr. Pavelek proposes that the following settlement be implemented: Eliminate claimant categories, and distribute settlement proceeds in proportion to each class member's loss, as reflected by the difference between the market value of the Rights at issue or the purchase price of the Rights, minus the sale price or total amount distributed per Right (approximately $33.30).

Plaintiffs' counsel believe that Mr. Pavelek confuses the concept of recognized loss—which is the basis upon which the Settlement Fund is to be allocated among class members—with the absolute amount of compensation class members will receive from the settlement, and that Mr. Pavelek's approach fails to take into account the differing strengths of the claims asserted by class members whose claims fall within different categories. By letter dated February 17, 1989, class counsel wrote to Mr. Pavelek and explained the settlement to him. Class counsel also note that they tried to reach him by phone, but his number was unlisted (Class Plaintiffs' Memorandum in Support of the Proposed Settlement, at 37). The Court rejects Mr. Pavelek's objection for want of merit, essentially for the reasons noted by class counsel.

Intervenor Grant S. Lewis P.C. Pension Trust, the owner of 300 Rights that it received on initial distribution, argues that the settlement should not be approved be-

cause Union Carbide previously admitted that it owes class members $.85 per Right for the amount withheld pending litigation of the dividend equivalent holders' claims (the *Nicholson* litigation), while the settlement will only pay $.50 per Right, and Rightsholders will be forever barred from making any claims as to the amount withheld. This objectant argues that Rightsholders are now entitled to at least $1.00 per Right ($.85 + interest), so that the settlement is not beneficial or prudent.

Plaintiffs' counsel respond essentially by agreeing with Union Carbide that very substantial issues of law and fact are present in the *Nicholson* litigation, discussed earlier, and that there is great uncertainty as to whether, or when, any portion of that $.85 per Right ($27 million withheld) would become available to the Rightsholders. Plaintiffs' counsel further assert that they conducted an investigation into the merits of the dividend equivalent holders' case, the value of the claim, and the timing of any possible disposition of the *Nicholson* case, and took these into account before entering into the Stipulation of Settlement. Based on this Court's own analysis of the proposed settlement, it is convinced that a reasonably prudent businessman in the position of a member of the plaintiff class would agree to its terms, and that notwithstanding the superficial appeal of the mathematics of this objection, the proposed settlement is fair and reasonable, in accordance with our own analysis of the *Nicholson* issue.

The Grant S. Lewis P.C. Pension Trust, in its Supplemental Memorandum, appears to limit its objection to the proposed allocation of the Settlement Fund, and requests that the distribution be revised for the benefit of current Rightsholders. Plaintiffs' counsel believe that it would be inappropriate to revise the allocation plan which is based on plaintiffs' counsels' opinion of the relative strengths of the class members' claims, as gleaned from discussions with persons from all the various class-member categories. This Court stated in *In re Baldwin–United Corp. (Single Premium Deferred Annuities Insurance Litigation)*, 607 F.Supp. 1312 (S.D.N.Y.1985):

[B]ecause of the strong policy in favor of settlements, the evidence heard by the court must be weighed according to a burden of proof which shifts to the objecting class members once the proponents have met their initial burden of proving 'that the settlement was reached as a result of arm's length negotiations, that the proponents are represented by counsel experienced in similar cases, that there has been sufficient discovery to enable counsel to act intelligently, and that the number of objectants or the relative size of their interests is small.'

*Id.* at 1320 (citations omitted).

While the Court is interested in whatever views may aid a just and informed decision, and has considered all of the objections presented and points raised by all participants, together with the views of the settling parties' counsel, the Court finds that plaintiffs have met their burden. This settlement was negotiated at arm's length after discovery, including 50 depositions, was almost complete. This Court is fully familiar with and has supervised this litigation since its inception. The Court is aware of the fact that this litigation has been hotly contested and that many complex issues of fact and law remain unclear. In contrast, the objectors have not made any showing that would justify substituting their views for the opinions of counsel representing the class in this situation where reasonable persons might disagree.

Accordingly, the Court finds that the proposed settlement is fair and reasonable, and should be allowed to proceed in the face of the objections, and that the proposed allocation of the recovery in settlement is also fair and reasonably related to the presumed merits of the respective claims in light of the attendant risks of litigation.

*Attorneys' Fees*

■ The terms of the Stipulation of Settlement provide that the legal fees of counsel who produced the settlements for plaintiffs shall be paid out of the Settlement Fund in an amount to be fixed by the Court, not greater than 22.5% of the recov-

ery. The specific fee requested, $5,819,-152, which represents a lodestar of $2,268,-368 with a multiplier of 2.6% for lead counsel and 2% for the time expended by other counsel, amounts to approximately 18.34% of the Settlement Fund.

All attorneys for plaintiffs, except Harvey Greenfield, Esq., have made a joint application for attorneys fees and disbursements. Mr. Greenfield has made a separate application which is opposed by the plaintiffs' liaison counsel. In a subsequent joint letter dated April 7, 1989 from Jerome M. Congress and Harvey Greenfield, however, the attorneys indicated that joint petitioning counsel would not challenge a lodestar figure for Mr. Greenfield of $90,000, and that Mr. Greenfield would accept that lodestar figure as a predicate for determining his fee award. Mr. Greenfield requests a multiplier of 2.6, but has stated that he will not challenge the determination of this Court.

As they are required to do, the counsels' joint fee application contains the affidavits and billing records concerning their time charges over the three-year course of this litigation. This showed hourly time charges in excess of 10,830 hours. In addition, counsel request a multiplier, in light of the results achieved. The requested multiplier would not cause the fee award to exceed the 22.5% limitations placed thereon in the Stipulation of Settlement and notice to the class.

The notice to class members further informed them that class plaintiffs' counsel would seek reimbursement of expenses not to exceed $500,000 over and above the costs of notice and administration of the settlement. The cost of administering the settlement, including the costs of notice, would be paid from the Settlement Fund in addition to the fees and expenses of the class.

The Proposed Final Order and Judgment submitted by the settling parties provides for a supplemental application for reimbursement of additional expenses and fees that may be incurred before the Settlement Fund is distributed to authorized claimants. In addition, there is the likelihood of appellate review in this matter, which will require additional services on the part of the lawyers for plaintiffs.

This Court believes that it would be improvident at this time to make a determination concerning legal fees and disbursements, at least until a final judgment is rendered in this case on the merits, and becomes final. The lawyers' fee applications should be updated since counsel may incur additional expenses in the event of appellate review of our approval of the settlement. The lodestar in this case has only been computed through the date of March 10, 1989. In the interests of fairness, the lodestar should at the very least be brought down to the date of the judgment to be entered on these findings and conclusions.

Accordingly, the Court determines that the resolution of the fee request should be deferred pending appellate finality of the judgment to be entered on these findings. The issue of legal fees shall be severed and jurisdiction shall be reserved to determine these issues at a later date. For purposes of approving the proposed settlements, it is sufficient for this Court to observe, and it does find, that the plaintiffs' attorneys rendered valuable services in a diligent and efficient manner under difficult and complex circumstances. They played a significant part in achieving a beneficial result. The attorneys will be entitled to some multiplier; whether or not in the amount requested it is premature to decide.

In connection with its findings concerning fairness and reasonableness, the Court concludes and finds that even if the legal fees paid extend in full to the limitation set forth in the notice, the settlement is nonetheless beneficial, fair and reasonable, and compares favorably with the recovery of the class were the matter to proceed to trial.

The application for the approval of the Stipulation of Settlement is hereby granted. There is no just cause for delay. Fed. R.Civ.P. 54(b). A judgment shall be entered at this time which shall reserve jurisdiction for the purpose of deciding the application for attorneys' fees and expenses

and to supervise implementation of the settlement.

Counsel are directed to settle a judgment on notice or waiver of notice, consistent with this opinion, to be received by the Court on or before July 25, 1989.

SO ORDERED.